STATE OF NORTH CAROLINA v. STANLEY SANDERS

No. 88A85

(Filed 29 August 1990)

**1. Searches and Seizures § 2 (NCI3d)— search and seizure by civilian—items seized inadmissible**

The trial court did not err in a prosecution for first degree murder and first degree rape by denying defendant's motion to suppress a ring and watch taken from the victim's residence and seized from defendant's bedroom by a civilian, Curtis Gardin. While Gardin's actions were based on information shared with him by government investigators and furthered their efforts, Gardin's primary purposes were to console the grieving family which he had known a long time and to alleviate tensions the murder had caused in the community. Furthermore, defendant failed to show that Gardin was acting as an agent for the State when he searched defendant's bedroom and seized the watch and ring.

**Am Jur 2d, Searches and Seizures §§ 13, 14.**

**2. Constitutional Law § 28 (NCI3d)— false and misleading testimony from deputy—defendant not deprived of fair trial**

Defendant was not deprived of his right to a fair trial by false and misleading testimony from a deputy where defendant failed to establish either that the testimony was material or that the prosecution knew it was false and intentionally used it to defendant's prejudice.

**Am Jur 2d, Criminal Law § 829.**

STATE v. SANDERS

[327 N.C. 319 (1990)]

**3. Searches and Seizures § 19 (NCI3d)— evidence seized pursuant to flawed warrant—admission not prejudicial**

There was no prejudicial error in a prosecution for first degree rape and first degree murder in the admission of evidence seized pursuant to a flawed search warrant where the evidence had minimal probative value and little prejudicial impact, and in light of the overwhelming admissible evidence of defendant's guilt.

**Am Jur 2d, Evidence § 408.**

**4. Criminal Law § 75 (NCI3d)— confession—invalid search—subsequent arrest proper—confession admissible**

The trial court did not err in a prosecution for first degree murder and first degree rape by admitting defendant's confession where defendant's arrest was proper despite an invalid search preceding the arrest because other information lawfully obtained independently of information obtained in the invalid search provided probable cause for defendant's arrest. Defendant's confession was not obtained by trickery, duress, or in violation of his right to counsel because defendant's arrest and a private citizen's seizure of a watch and ring taken from the victim were valid and there was therefore no unconstitutional activity to taint the confession. Defendant's contention of duress was meritless in that it was based on the fact that law enforcement officers confronted the defendant during questioning with a watch and ring lawfully obtained.

**Am Jur 2d, Evidence § 546.**

**5. Witnesses § 1.4 (NCI3d); Criminal Law § 361 (NCI4th)— master witness list—name omitted—not allowed to testify**

The trial court did not abuse its discretion in a prosecution for first degree rape and first degree murder by refusing to allow the testimony of a witness who would have been defendant's fifth alibi witness and whom defendant had failed to include on a master list of all potential witnesses. Defendant received explicit instructions that only those names submitted on the master list would be allowed to testify, defendant stated before trial that the list was complete, did not explain why he omitted the witness's name, expressed no special circumstances or need for the testimony, and the testimony would have been cumulative.

Am Jur 2d, Witnesses § 74.

### 6. Criminal Law § 443 (NCI4th) — prosecutor's closing argument — prosecutor's duty — not improper

A prosecutor's argument in a prosecution for first degree rape and first degree murder that he had taken an oath to fairly enforce the criminal laws and would dismiss a prosecution if he suspected anything wrong in the investigation was made in response to defendant's allegation of a "setup" and was not so grossly improper as to require the trial court to intervene *ex mero motu.*

Am Jur 2d, Trial §§ 218, 274.

### 7. Criminal Law § 1352 (NCI4th) — murder — sentencing — unanimity requirement — new sentencing hearing

A defendant found guilty of murder and sentenced under instructions containing unanimity requirements ruled unconstitutional in *McKoy v. North Carolina*, 108 L. Ed. 2d 369, was entitled to a new sentencing hearing where there was prejudice in that there was evidence to support the submitted but unfound mitigating circumstances. Although defendant did not object to the instructions at trial, the Supreme Court chose to apply Appellate Rule 2 and consider the error as if defendant had timely objected.

Am Jur 2d, Homicide § 513.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27,[1] from judgments imposing a sentence of death and a sentence of life imprisonment, entered by *Winberry, J.,* at the 4 February 1985 Criminal Session of Superior Court, TRANSYLVANIA County.[2] Heard in the Supreme Court on 9 March 1987. Reargued on 14 December 1988.

---

1. At the time of defendant's appeal, N.C.G.S. § 7A-27 permitted appeals directly to this Court from all sentences of death or life imprisonment. The statute was amended in 1987 to permit direct appeals only from first degree murder convictions.

2. Defendant was previously tried and convicted in June 1982 but inaccurate and inadequate transcriptions of these trial proceedings required this Court to vacate the convictions and remand for a new trial. *State v. Sanders*, 312 N.C. 318, 321 S.E.2d 836 (1984) (per curiam).

STATE v. SANDERS

[327 N.C. 319 (1990)]

*Lacy H. Thornburg, Attorney General, by J. Michael Carpenter and William N. Farrell, Jr., Special Deputy Attorneys General, for the State.*

*Ann B. Petersen and James R. Glover for defendant appellant.*

EXUM, Chief Justice.

Defendant was tried on proper bills of indictment charging him with first degree murder and first degree rape. After hearing arguments, we remanded for a hearing on defendant's motion to suppress certain evidence. This hearing was conducted at the 24 August 1987 Special Session of Superior Court, Transylvania County, Saunders, J., presiding. On 25 September 1987, Judge Saunders, after making findings of fact and conclusions of law, ordered that defendant's motion be granted in part and denied in part. Defendant assigned error to various aspects of this order, additional briefs were filed and the case was reargued on 14 December 1988.

We find no error in the hearing on defendant's motion to suppress or in Judge Saunders' 25 September 1987 order. Neither do we find error in the guilt phase of defendant's trial. The decision in *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990), requires that we remand for a new sentencing proceeding.

I.

The State's evidence at trial tended to show the following:

On 10 November 1981 the seventeen-year-old victim Jackie Lee lived with her two sisters and her mother in Brevard. Her mother worked at a local paper mill on the midnight to 8 a.m. shift. On the afternoon of 10 November 1981 the victim arrived home from school at around 3:15 p.m., changed into sweatclothes and went jogging. After returning, she watched television with her mother until 7:30, and then dropped her mother off at a restaurant.

Mrs. Lee returned home at approximately 10:45 p.m. She discovered her car parked in front of the house with the door ajar and her daughter's purse on the ground. The front door of her home was also open and inside lights were on. Two of Jackie's friends subsequently arrived and began looking for her.

Mrs. Lee reported to work at 11:55 p.m. Approximately five minutes later, she received a telephone message from one of the

friends reporting that Jackie's keys had been found near the front porch. Mrs. Lee immediately returned home and called the police. She discovered her daughter's jogging pants strewn on the bathroom floor and that her own white gold watch and topaz ring were missing. Mrs. Lee later provided investigating officers with drawings of both items.

The police began searching for Jackie. Between 3 and 4 a.m., they found a necklace belonging to Jackie behind the house. They also found some coins and bloody leaves near the picnic table in the Lees' backyard.

At approximately 5:30 p.m. on 11 November a neighbor discovered the victim's body in a nearby field. Her face was badly bruised; there were scratches on her arms and a gunshot wound in her chest. A fencepost, approximately four feet long with bloodstains on one end, was found nearby.

Dr. Page Hudson performed an autopsy on 12 November 1981. Injuries to the victim's head included a badly fractured skull, a bruised right cheek, a linear scrape on the chin, numerous tiny-dot hemorrhages on both sides of the head, lacerations on the lip, and a chipped front tooth. The bruising in the right cheek extended approximately five inches. Dr. Hudson testified that these injuries could have been inflicted by a hand and the bruising to the right cheek was likely caused by several blows. There was blood on the surface of the brain and a tear in the cerebellum. On the opposite side, there were small hemorrhages on the brain's surface. Dr. Hudson testified that a blunt object, possibly the fencepost found near the body, caused the skull fracture. Scratches and bruise lines were also found on the victim's neck. Between the lines were small circular bruises. Dr. Hudson testified that the victim had been strangled by a belt with grommets surrounding its perforations. He stated that defendant's belt, which had been examined, could have caused these marks. Dr. Hudson testified that the victim was alive when she was shot in the chest. He also found superficial tears in the vulva area and next to the anus. Spermatoza was found both inside and outside the vagina. He testified that these injuries were consistent with forcible sexual intercourse. Dr. Hudson stated that the injury to the back of the head, the gunshot wound, and the strangulation were each potentially fatal.

On 4 December 1981, law enforcement officers searched defendant's residence. They seized jewelry thought to be stolen and am-

munition boxes. Defendant was subsequently arrested as he approached his house.

Included in the jewelry listed as seized during the search were the gold watch and topaz ring belonging to Jackie's mother. The State introduced these items at trial, and Jackie's mother identified them. She testified that she remembered seeing both pieces of jewelry on top of her dresser before leaving for work on the night Jackie was murdered.

Sheriff's Deputy Hubert Brown also testified about the topaz ring and gold watch. He maintained that law enforcement officers recovered these items while searching defendant's home.

After defendant's arrest, SBI Assistant Supervisor Dan Crawford and Deputy Brown questioned defendant at the Transylvania County Sheriff's Department. Defendant waived his rights and agreed to speak with the officers. When shown the watch and ring that had been stolen from the victim's home and recovered in defendant's bedroom, defendant claimed that he had owned the items for "about a year." Until then, there had been no mention of the Lee murder or theft. Deputy Brown stated that he could not understand how defendant could have possessed both items for a year since they belonged to the Lee family on 10 November 1981. At that point, defendant denied killing anyone. Deputy Brown then left the room.

The conversation continued between Agent Crawford and defendant. The interview room had a two-way glass mirror through which several officers, including Deputy Brown, SBI Agent Davis Jones and Chief L. B. Vaughan of the Brevard Police Department observed the interview. Crawford advised defendant that the victim had been strangled, shot, and had her head bashed.

Defendant eventually stated that "it was an accident," he "didn't mean to do it," and that he wanted to tell about it. Defendant related that he had known the victim and had talked to her on the telephone. He described leaving his home on 10 November 1981 after dark and walking to the Lee home. He went around to the rear of the house where he watched the victim through a bedroom window. He came to the front of the house and as he was entering the porch, the victim came out the front door. She saw defendant and screamed. He grabbed her and forced her around the side of the house to the rear. The victim fell and hit

STATE v. SANDERS

[327 N.C. 319 (1990)]

her head on a bench. He told her he needed money. She replied that her pocketbook was in the car in front of the house. He forced the victim back up the side of the house, across the yard and between several houses to Maple Street. They proceeded down another street and into a field. He removed his coat and they sat down and began to talk, subsequently having sexual intercourse. The victim then dressed herself and they continued talking. Defendant saw a light on in a house and thought he saw a man watching.

Defendant decided to put the victim "to sleep" by the use of a choke hold he had learned in the military, squeezing her neck until she went limp. He realized that he had choked her too hard and believed she was dead. When defendant thought he saw her move, he picked up a fencepost and hit her in the head. Unsure whether she were dead, he hit her again.

As defendant got up to leave he saw the moon reflect off his gun, which was on the ground. Defendant went back, picked up the gun and fired one time toward the victim's chest. Defendant had borrowed the gun from an acquaintance.[3] After shooting the victim, defendant walked from the field to his girlfriend's house. He played cards and later went home to bed.

Defendant admitted to Agent Crawford that he had been in the Lee residence before 10 November 1981 and had taken jewelry. He specifically admitted that he took the gold watch and topaz ring on 10 November 1981. Several officers who observed the discussion between defendant, Brown and Crawford corroborated the versions of defendant's statement presented by the State at trial.

Defendant's evidence tended to show he was not with the victim on the evening of the murder. Several witnesses testified that defendant was at a Carver Street poolroom that night. Curtis Gardin, a civilian, also testified. He related his role in the investigation and the 4 December 1981 search of defendant's home. Gardin claimed that he had procured the topaz ring and white gold watch from defendant's bedroom after defendant's sister invited him into their home.

---

3. The acquaintance offered corroborating testimony for the State. A firearms expert testified that this gun was of the same caliber as the one used to shoot the victim. While the bullet removed from the victim's body was too damaged to be conclusively matched to the gun, it did bear similar rifling characteristics to other bullets fired from the gun.

STATE v. SANDERS

[327 N.C. 319 (1990)]

The jury convicted defendant of first degree murder and first degree rape.

During the capital sentencing proceeding, the State presented no additional evidence. Defendant introduced the testimony of Billy Williamson Royal, M.D., a forensic psychiatrist at Dorothea Dix Hospital. Dr. Royal had examined defendant and determined that he was competent to stand trial and had been functioning well enough at the time of the Lee murder to be considered responsible for his actions. Dr. Royal testified that even though defendant was competent to stand trial, he suffered from a significant mental illness, possibly paranoid schizophrenia. Dr. Royal further diagnosed identity disorders and antisocial traits as aspects of defendant's illness and testified that defendant had a history of psychological problems. No other witnesses were called.

The trial court instructed the jury and submitted a verdict sheet to it. The jury found two aggravating circumstances unanimously and beyond a reasonable doubt: (1) that defendant committed murder while engaged in flight after committing rape; and (2) that the murder was especially heinous, atrocious or cruel.

The jury found unanimously and answered "yes" to the mitigating circumstance that the "murder was committed while [defendant] was under the influence of [a] mental or emotional disturbance." The jury failed to find unanimously and answered "no" the following proposed mitigating circumstances submitted to it:

[1]. The capacity of [defendant] to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

[2]. Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

The jury then found unanimously and beyond a reasonable doubt that the mitigating circumstance it found was insufficient to outweigh the aggravating circumstances it found; that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstance it found; and that defendant should be sentenced to death rather than life imprisonment. The trial court entered judgment accordingly. It also sentenced defendant to life imprisonment for first degree rape. Defendant appealed to this Court.

## II.

### A.

[1]   Defendant assigns as error the trial court's denial of his motion to suppress as evidence the topaz ring and white gold watch seized by Curtis Gardin, the civilian who searched defendant's bedroom.

Deputy Hubert Brown obtained a warrant to search defendant's premises, alleging that probable cause arose from a reliable, confidential informant's report that the informant saw incriminating evidence in defendant's home.

At defendant's first trial he moved that the State reveal the identity of the informant and that the trial court suppress the evidence purportedly seized pursuant to the search warrant on the grounds that it was seized illegally by an agent for the State. This motion was supported by the testimony of defendant's sister. The trial court denied both motions and found the sister's testimony to be "inherently lacking in credibility."

At defendant's second trial, he again moved to suppress the seized evidence. In support of this motion, defendant tendered the testimony of Curtis Gardin, who he claimed was the informant mentioned in Deputy Brown's search warrant application. The trial court refused to hear Gardin because he was not called as a witness at the suppression hearing before defendant's first trial, and denied defendant's motion under the theory of *res judicata.*

After defendant's convictions at the second trial, he appealed to this Court. On 7 April 1987 we remanded to the trial division for the sole purpose of hearing defendant's motion to suppress. We ordered that all witnesses tendered by either the State or defendant offering competent testimony on issues raised by defendant's motion be heard, and that the trial court should then make findings of fact and conclusions of law before entering an order on the motion.

Judge Saunders heard the motion at the 24 August 1987 Criminal Session of Superior Court, Transylvania County. The court issued an order on 25 September 1987, finding the following facts (paraphrased except where quoted):

Curtis Gardin, a long-time friend of the victim's family, first became involved in this case when he visited the Lee home after the murder. He told the family that he would help in any way

possible to relieve the "grief of the family" and the "turmoil in the community." He wanted to "do what was just." The victim's sister asked Gardin to call the Transylvania Sheriff's Department. On or about 20 November 1981 Gardin voluntarily went to the Sheriff's Department and met with the case investigator, Deputy Brown. Before then Gardin had no specific information concerning the Lee murder, and had never met Brown nor served as an inform-ant for him.

Deputy Brown told Gardin he suspected that a person probably known to Gardin was the murderer. Brown described a pattern of behavior attributed to the suspect, and Gardin responded that "it's probably Stanley," apparently referring to defendant. Brown then told Gardin his hypothesis of the murder, explaining how it was similar to another crime for which defendant was a suspect. Deputy Brown stated that he needed only a little more information to conclude the investigation with defendant's arrest. Brown showed Gardin sketches of jewelry missing from the Lee home and de-scribed a red cowboy hat he believed was also stolen. Brown asked Gardin if he knew defendant's family and if he could get into their home to see if the jewelry was there. He told Gardin that defendant was known to keep stolen items in a box, and he instructed Gardin to "go into the community, locate Stanley, talk to him, and see what you can develop." Gardin was also told to look for a red cowboy hat in the community if nothing was found at defendant's home.

Gardin told Brown he had not visited defendant's home for some time and was not sure he could get into it. Brown advised Gardin that there was reward money offered, but Gardin denied any interest in it. Finally, Brown warned Gardin that he might get hurt and that he should say nothing about the matter until he decided about participating. Deputy Brown gave Gardin the code name "Blueboy" if Gardin decided to contact him.

Gardin later discussed with his mother whether he should get involved. Over her objections he decided to help because he believed "Jesus placed the task in front of me." Gardin contacted Brown a second time, indicating he had developed a plan to gain entry into defendant's home by requesting an old recipe from de-fendant's mother. There is no evidence that Brown approved or disapproved this plan or offered Gardin any instructions.

**STATE v. SANDERS**

[327 N.C. 319 (1990)]

On 3 December 1984 Gardin went to defendant's home and asked for the recipe. Gardin then visited the home of defendant's sister Teresa Wynn and said he was looking for a red cowboy hat for his daughter. With Wynn's permission Gardin looked around her house. Brown never told Gardin to do this.

Gardin returned to defendant's home on 4 December and talked with another of defendant's sisters. He told her he wanted a recipe and she let him into the house. Gardin then explained that a friend had some jewelry stolen by defendant, and that if it were returned no charges would be brought. The sister led Gardin to defendant's bedroom and there they located a box of jewelry. Gardin examined the contents, finding a topaz ring and a white gold Caravelle watch matching the sketches he had seen at the Sheriff's office. He removed these items from the box and left.

Brown never directed Gardin to take the jewelry, nor did Brown know about the ruse to gain access to defendant's room. Brown was not present when Gardin took the jewelry and could not have prevented it. "There is no evidence that Gardin was ever compelled by Investigator Brown for any reason to act the way he did."

Gardin took the jewelry to his sister and asked her advice. She suggested he not get involved. Gardin then went to see Deputy Brown, with whom he had not spoken since describing his plan to ask defendant's mother for a recipe. Gardin showed Brown the jewelry, explaining how he obtained the items. They discussed whether Gardin should have left the jewelry in defendant's home. Gardin expressed fear about returning to the home, and Brown said "We'll figure out something." Brown thanked Gardin and told him he would send him one thousand dollars whether Gardin wanted it or not.[4] Gardin then left the office.

Jackie's mother was brought to the sheriff's office. She identified the watch and ring as her own.

Brown contacted SBI agent Crawford and discussed the need for a search warrant, expressing a desire to keep Gardin's identity

---

4. The money was delivered three days later. Gardin ultimately received over seven thousand dollars for his assistance, which he accepted in part because he believed the black community had ostracized him and the police department failed to respond to threats made to him.

confidential. He was told that this was possible only if Gardin had been a confidential, reliable informant in the past. Brown misrepresented to Agent Crawford that Gardin had previously served as an informant.

At 4:50 p.m. on 4 December 1984, Brown applied for a warrant. He asserted that there was probable cause to believe a lady's watch, ring, and necklace, and a red cowboy hat were to be found on defendant's premises. He stated the following basis for probable cause:

> On today's date a reliable informant who has proven reliable in the past and given me information which resulted in the arrest and convictions of persons involved in other felony cases . . . stated to me today around 2:00 p.m. that after visiting at the residence of Hattie and Stanley Sanders, the said inform-ant observed jewelry with the same description and type known to have been stolen from the residence of Linda Lee on Turn-pike Dr., Brevard, N.C. Informant further stated they looked at a Caravelle Bulova lady's wristwatch and a gold topaz ring with large stone which is property described as taken in a felonious breaking and entering of the Lee residence on Nov. 10, 1981. The informant told me they also observed a large quantity of other jewelry and rings and necklaces of all types in the Hattie and Stanley Sanders residence.

When this application was prepared, Brown already possessed the watch and ring, having received them from Gardin. Gardin had never before served as an informant.

The warrant was served. Among the items listed as recovered in the search by law enforcement officers were the two jewelry pieces Gardin had delivered to Brown earlier that afternoon. The watch and ring were not seized pursuant to the warrant. While the warrant was being executed defendant approached the house and was arrested.

Based on these factual findings, the trial court drew the follow-ing conclusions of law: that when Gardin seized the ring and watch he was acting as a private person and not as a government agent or instrument; and that after properly striking the false information found on the warrant, it was invalid as offering no assurances of credibility. Therefore, evidence seized under the warrant was inadmissible. The court ordered that the State was entitled to

STATE v. SANDERS

[327 N.C. 319 (1990)]

introduce the ring and watch as evidence seized by a private person, but that defendant was entitled to suppress the other items seized by police officers pursuant to the invalid 4 December 1984 warrant.

Defendant assigns as error the trial court's denial of his motion to suppress as evidence the topaz ring and white gold watch seized by Curtis Gardin. Defendant contends that Gardin was acting as an agent for the State when he seized the victim's jewelry, thereby violating defendant's right to be free from unreasonable government searches and seizures under the fourth and fourteenth amendments to the federal Constitution and Article I, Section 20 of the North Carolina Constitution.

The trial court, after making the foregoing findings of fact and conclusions of law, concluded otherwise. Because the evidence supports the court's findings of fact,[5] which in turn support its conclusions of law, we find no error in the court's denial of defendant's motion to suppress the white gold watch and topaz ring.

The fourth amendment as applied to the states through the fourteenth amendment protects citizens from unlawful searches and seizures committed by the government or its agents. This protection does not extend to evidence secured by private searches, even if conducted illegally. *Burdeau v. McDowell*, 256 U.S. 465, 65 L. Ed. 1048 (1921). The party challenging admission of the evidence has the burden to show sufficient government involvement in the private citizen's conduct to warrant fourth amendment scrutiny. *United States v. Snowadzki*, 723 F.2d 1427 (9th Cir. 1984).

In *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564 (1971), *reh'g denied*, 404 U.S. 874, 30 L. Ed. 2d 120 (1971), the United States Supreme Court considered whether the defendant's wife was a government agent when she permitted police officers to search her husband's bedroom. The Court stated that if the exclusionary rule were to apply to the evidence obtained from Mrs. Coolidge, it would have to be based upon some type óf unconstitutional police conduct. The Court emphasized that the fourth and fourteenth amendments in no way should "discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge*, 403 U.S. at 488, 29 L. Ed. 2d at 595.

---

5. Defendant makes no contention that Judge Saunders' findings are not supported by the evidence.

STATE v. SANDERS

[327 N.C. 319 (1990)]

This Court also has expressed the standard for determining whether a private party has acted as an agent of the government when searching for and seizing evidence:

> When a private party has engaged in a search and has seized property or information, the protections of the fourth amendment apply only if the private party "in the light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the State." *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). Once a private search has been completed, subsequent involvement of government agents does not transform the original intrusion into a government search. *United States v. Sherwin*, 539 F.2d 1, 6 (9th Cir. 1976).

*State v. Kornegay*, 313 N.C. 1, 10, 326 S.E.2d 881, 890 (1985).

Some courts have adopted a two-factor analysis for determining whether a private citizen's search or seizure amounts to government action: (1) whether the government instigated, participated, or acquiesced in the citizen's conduct; and (2) whether the citizen engaged in the search with the intent to further law enforcement efforts. *United States v. Bazan*, 807 F.2d 1200 (5th Cir. 1986); *United States v. Lambert*, 771 F.2d 83 (6th Cir. 1985); *United States v. Snowadzki*, 723 F.2d 1427 (9th Cir. 1984); *United States v. Miller*, 688 F.2d 652 (9th Cir. 1982); *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981).

In a number of cases courts have determined there was no governmental involvement in a search by a private citizen. *See, e.g., Peters v. State*, --- S.C. ---, 393 S.E.2d 387 (1990) (private citizen visiting ill sister found LSD underneath a lamp, and believing it belonged to the sister's husband, notified authorities, who instructed her to return and retrieve the drugs for them); *United States v. Jennings*, 653 F.2d 107 (4th Cir. 1981) (after being tipped by DEA agents regarding drug shipment, airline employee after inviting DEA agent to be present searched a suspicious-looking package); *United States v. Pierce*, 893 F.2d 669 (5th Cir. 1990) (similar facts to *Jennings*); *United States v. Koenig*, 856 F.2d 843 (7th Cir. 1988) (Federal Express employee independently opened suspicious package and subsequently delivered it to authorities).

When crime victims seek to recover their own property by searching a defendant's premises, the search may be deemed a

private act not attributable to the police. *State v. Peele,* 16 N.C.App. 227, 192 S.E.2d 67 (1972), *cert. denied,* 282 N.C. 429, 192 S.E.2d 838 (1972).

Several courts, after examining police encouragement of a private citizen, have concluded the encouragement was insufficient to subject the private searches to constitutional scrutiny. *Snowadzki,* 723 F.2d 1427 (defendant's co-worker contacted IRS, reported tax evasion, copied and forwarded defendant's records, and inquired about reward money); *United States v. Miller,* 688 F.2d 652 (9th Cir. 1982) (after citizen passed a tip to police that property stolen from him was at defendant's business, FBI agents invited citizen to visit the business with them, suggesting citizen pose as a customer; citizen saw and later returned to photograph stolen items); *People v. Sellars,* 93 Ill. App. 3d 744, 417 N.E.2d 877 (1981) (after individuals reported defendant's burglary and possession of stolen property, officers suggested they get invited inside the apartment and directed them to report observations of items stolen from them; they subsequently delivered to police stolen items they confiscated after breaking into apartment; because police never encouraged the breaking, held individuals not agents of police).

In other cases a private citizen's search or seizure was attributable to the State and evidence was suppressed under the fourth amendment exclusionary rule. *See, e.g., Walther,* 652 F.2d 788 (airline agent was a regular informant, and his sole motivation in searching luggage that DEA agents could not search was the expectation of reward money); *People v. Barber,* 94 Ill. App. 3d 813, 419 N.E.2d 71 (1981) (landlord met police at defendant's apartment at a prearranged time, inviting them inside where they discovered stolen items; the meeting was for the joint purposes of determining whether the defendant had moved out without notification and of seeing if stolen items were within the premises); *United States v. Robinson,* 504 F. Supp. 425 (N.D. Ga. 1980) (airline employee retrieved the defendant's suitcase for DEA agents and accompanied them, opening it without defendant's consent in the presence of the agents whose conduct had encouraged the employees' actions, despite the absence of a verbal request to open the case); *State v. Boynton,* 58 Haw. 530, 574 P.2d 1330 (1978) (police actively recruited a citizen to climb a fence and peer into an enclosed area); *Corngold v. United States,* 367 F.2d 1 (9th Cir. 1966) (airline employees searched luggage for stolen watches at the request of the police).

**STATE v. SANDERS**

[327 N.C. 319 (1990)]

Based on the authorities we have reviewed and general principles of fourth amendment jurisprudence, we conclude that determining whether a private citizen's search or seizure is attributable to the State and therefore subject to constitutional scrutiny demands a totality of the circumstances inquiry. Factors to be given special consideration include the citizen's motivation for the search or seizure, the degree of governmental involvement, such as advice, encouragement, knowledge about the nature of the citizen's activities, and the legality of the conduct encouraged by the police.

While defendant has demonstrated that some of Gardin's activities were attributable to the State, under all the circumstances he has failed to show that Gardin's seizure specifically of the topaz ring and white gold watch was so attributable.

Defendant attempts to distinguish Gardin's actions from those cases allowing into evidence items seized by private citizens. Because Gardin had no independent duty to search and no motive to recover his own property, defendant argues that he acted with the intent to assist the police. Defendant also argues that the government conduct in the search was pervasive enough to attribute Gardin's actions to the State. Therefore, he contends that the search violated the fourth and fourteenth amendments. We disagree.

The evidence supports the trial court's findings which relate to Gardin's personal motivations for visiting defendant's residence. His expressed intent when searching defendant's home and seizing evidence was a desire to help "relieve the grief of the family" and end the "turmoil in the community." He met with Deputy Brown only after the victim's sister asked whether Gardin still wanted to help the family, and did not immediately agree to be an informant. He solicited advice from his mother and she discouraged his involvement. Gardin only agreed to participate over his mother's objections after concluding that "Jesus placed the task in front of" him. After seizing the jewelry, Gardin's actions of deliberating and seeking advice from his sister further indicates that his primary intent was not to serve law enforcement efforts. While Gardin's actions were based on information shared with him by government investigators and furthered their efforts, Gardin's primary purposes were to console a grieving family which he had known a long time and to alleviate tensions the murder had caused in the community.

STATE v. SANDERS

[327 N.C. 319 (1990)]

Neither has defendant shown sufficient governmental involvement to render Gardin a State agent as to all his investigatory activities. The extent of Brown's recruitment of Gardin was to advise him that defendant was under suspicion, describe certain evidence that might link defendant to the crime, and to ask Gardin if he could gain entry into defendant's house or locate defendant and talk with him. Brown mentioned a reward fund and Gardin said he was not interested in money. The meeting ended with Brown warning Gardin to say nothing until Gardin made up his mind to participate, and giving Gardin a code name to use if Gardin called him. Only later, after Gardin believed Jesus "placed the task in front of" him, did Gardin call Brown and tell him he would visit defendant's home and ask for a recipe.

Even if these facts justify a conclusion that in visiting defendant's home on 3 December and asking for a recipe, Gardin was acting as an agent for the State, there is no similar government involvement in subsequent actions by Gardin. Deputy Brown had no knowledge of Gardin's later visit to defendant's sister. Gardin's subsequent seizure of evidence from defendant's bedroom was committed without the knowledge, encouragement or acquiescence of law enforcement officials.

At no time did any law enforcement official tell Gardin to do anything illegal. No officer ever knew of Gardin's ruse to gain entry into defendant's bedroom by lying to defendant's sister about defendant's criminal liability. No officer ever encouraged, instructed or even knew beforehand of Gardin's search of defendant's bedroom and seizing evidence, nor was any officer present when Gardin seized the evidence.

In light of all the circumstances, Brown's involvement both before Gardin conducted his private search and after Gardin had seized evidence from defendant's bedroom, fails to transform Gardin's private, unsolicited, unsupervised act of seizing evidence into a government search. Defendant has failed to show Gardin was acting as an agent for the State when he searched defendant's bedroom and seized the white gold watch and topaz ring. His motion to suppress as to these items was therefore properly denied.

B.

[2] Defendant next contends that Deputy Hubert Brown's trial testimony was false and misleading, prejudicing defendant and depriving him of his right to a fair trial. We disagree.

Brown testified at trial that he searched defendant's bedroom pursuant to a warrant on 4 December 1981 and seized a watch and ring matching descriptions provided by the victim's mother. During cross-examination Brown acknowledged knowing and speaking with Curtis Gardin, but refused to answer questions regarding what he had asked Gardin to do or whether Gardin had entered defendant's home. Brown testified that he never paid Gardin any money. Brown's testimony about who found the jewelry and whether Gardin was paid for his information was directly contradicted by Gardin's own testimony. Both Brown's and Gardin's versions of this incident were before the jury.

The State concedes that portions of Brown's testimony were false or misleading. At the posttrial hearing on defendant's motion to suppress evidence, Judge Saunders found that Curtis Gardin seized the watch and ring from defendant's bedroom and delivered the items to Brown, later receiving reward money from him. Defendant contends that because these facts are inconsistent with Brown's trial testimony, he is entitled to a new trial. We disagree.

When a defendant shows that "testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction," he is entitled to a new trial. *See, e.g., State v. Robbins*, 319 N.C. 465, 514, 356 S.E.2d 279, 308 (1987), *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

In *Mooney v. Holohan*, 294 U.S. 103, 112, 79 L. Ed. 791, 794 (1935), the defendant alleged that the sole basis of his conviction was the government's knowing use of perjured testimony. The United States Supreme Court agreed, noting that "deliberate deception of the court and jury" was "inconsistent with the rudimentary demands of justice." The Supreme Court has used *Mooney* and its progeny to establish a "standard of materiality" under which the knowing use of perjured testimony requires a conviction to be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Augurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-350 (1976). *See also Pyle v. Kansas*, 317 U.S. 213, 87 L. Ed. 214 (1942); *Alcorta*

STATE v. SANDERS

[327 N.C. 319 (1990)]

*v. Texas*, 355 U.S. 28, 2 L. Ed. 2d 9 (1957); *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217 (1959); *Miller v. Pate*, 386 U.S. 1, 17 L. Ed. 2d 690 (1967); *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104 (1972); *Donnelly v. DeChristoforo*, 416 U.S. 637, 40 L. Ed. 2d 431 (1974). In *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217 (1959), a new trial was granted because the State's chief witness, the defendant's accomplice, lied about receiving promises of consideration for his testimony. Likewise, in *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104 (1972), a new trial was awarded when the prosecution knowingly allowed false testimony to stand uncorrected. The testimony was offered by the only witness linking the defendant to the crime and therefore was unquestionably material.

Defendant contends that under *Mooney, Napue* and *Giglio* he is entitled to a new trial.

Although Brown's testimony was in part false, defendant fails to establish either that it was material or that the prosecution knew it was false and intentionally used it to defendant's prejudice. Deputy Brown's testimony, with regard to how and by whom the white gold watch and topaz ring were found, is not material. The material fact linking defendant to the crimes is that these items were found in his bedroom. Brown's testimony was also shown to be false with regard to whether Gardin was paid. Again, this is not a material fact. It goes only to the credibility of the witness Gardin. The jury heard conflicting evidence on this point. Indeed, Gardin himself admitted that he had been paid. The jury could thus adjudge the credibility of both Brown and Gardin. We are confident beyond a reasonable doubt that Brown's misleading testimony did not contribute to defendant's conviction and that had Brown testified truthfully the trial's result would have been no different.

C.

[3] Defendant next assigns error to evidence introduced at trial which Judge Saunders in his 25 September 1987 order concluded should have been suppressed.

Deputy Brown applied for the warrant to search defendant's home by submitting an affidavit falsely describing Curtis Gardin as a "reliable informant who has proven reliable in the past and given information which resulted in the arrest and convictions of

persons involved in other felony cases." The State seized from the house ammunition and some jewelry belonging to the victim's family while executing the flawed warrant. This evidence was introduced at trial.

At the hearing on defendant's motion to suppress evidence Judge Saunders concluded as a matter of law that the warrant Brown obtained to search defendant's home "fail[ed] to meet either Constitutional or North Carolina statutory standards, and therefore is invalid," and that evidence seized pursuant to the warrant should not have been admitted at defendant's trial. While we agree with Judge Saunders' conclusions regarding this evidence, we hold the error in admitting it was harmless beyond a reasonable doubt.

This evidence had minimal probative value and little prejudicial impact. Evidence that additional jewelry and ammunition were found in defendant's bedroom was cumulative in light of other, properly admitted evidence, such as the white gold watch and topaz ring also found in defendant's bedroom. The victim's family testified, moreover, that those two items had been in their home on the night of the murder; but they could not remember whether the other jewelry items had been present at the home any more recently than two to four weeks before the killing.

Admission of the ammunition found in defendant's bedroom provided somewhat attenuated circumstantial evidence. The State's firearms expert testified the victim was shot with a .32 caliber weapon. He was unable to conclude that the handgun of that caliber found in defendant's bedroom had in fact fired the shots. Admission into evidence of the seized ammunition, only some of which was .32 caliber, added little to the properly admitted circumstantial evidence against defendant.

In light of the overwhelming admissible evidence of defendant's guilt, especially his possession of the topaz ring and white gold watch known to have been in the victim's home on the night she was killed and his own detailed confession, we hold the erroneous admission of other jewelry and the ammunition improperly seized during a police search of defendant's bedroom was harmless beyond a reasonable doubt.

D.

[4]   Defendant next contends that it was error to admit his confession into evidence. We disagree.

### STATE v. SANDERS

[327 N.C. 319 (1990)]

Before both his trials, defendant unsuccessfully moved to suppress evidence seized during the execution of the search warrant and all statements he made after arrest. He argued that the confession was obtained by duress and trickery and in violation of his right to counsel, and that it was the fruit of tainted evidence improperly seized under an invalid search warrant. For the first time on this appeal, he argues that there was no probable cause to arrest him. As such, he contends that the arrest itself was unlawful and the subsequent confession was inadmissible, having been obtained pursuant to an unlawful arrest.

Defendant's failure to assert before or during either of his trials that there was no probable cause for his arrest precludes him from doing so now. When the issue of an illegal arrest is not timely raised at trial, it will not be heard for the first time on appeal. *State v. Hunter*, 305 N.C. 106, 286 S.E.2d 535 (1982).

We have nevertheless elected to review this contention under Rule 2 of the North Carolina Rules of Appellate Procedure. We hold that defendant's arrest itself was proper despite the invalid search immediately preceding it. Other information lawfully obtained by investigators from Curtis Gardin, independently of information obtained in the invalid search, provided probable cause for defendant's arrest.

Whether probable cause exists to justify an arrest depends on the "totality of the circumstances" present in each case. *Massachusetts v. Upton*, 466 U.S. 727, 80 L. Ed. 2d 721 (1984); *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527 (1983); *State v. Arrington*, 311 N.C. 633, 319 S.E.2d 254 (1984). Information obtained from ordinary citizens cooperating with police may be entitled to a greater degree of credibility than information obtained from habitual informants. Indeed, "the ordinary citizen who has never before reported a crime to the police, may, in fact, be more reliable than one who supplies information on a regular basis." *United States v. Harris*, 403 U.S. 573, 599, 29 L. Ed. 2d 723, 743 (1971) (Harlan, J., dissenting). This Court has declined to demand of private citizens who are voluntarily assisting the police the same standards of reliability applicable to paid police informants. *State v. Martin*, 315 N.C. 667, 340 S.E.2d 326 (1986).

Applying these principles to the facts, we hold that Curtis Gardin's lawfully obtained information provided to law enforcement investigators was sufficiently reliable to establish probable cause

for defendant's arrest. Gardin turned over to the sheriff's department the topaz ring and white gold watch stolen from the victim's home on the night of the murder, stating that he found them in defendant's bedroom. Gardin was acting as a private citizen volunteering to assist the police out of the compassion he felt for the victim's family. Gardin's reliability and the information he lawfully provided were sufficient to establish probable cause for defendant's arrest.

Neither was defendant's confession obtained by trickery, duress, or in violation of his right to counsel. Because defendant's arrest and Gardin's seizure of the white gold watch and topaz ring were valid, there is no unconstitutional activity to taint the confession which followed adequate Miranda warnings and defendant's knowing and intelligent waiver of rights.

Defendant's allegations of duress are meritless since they arise only from the fact that while questioning defendant, law enforcement officials confronted him with the white gold watch and topaz ring seized from his bedroom by Curtis Gardin. Because these items were lawfully obtained, their exclusion is not required under *State v. Silva*, 304 N.C. 122, 282 S.E.2d 448 (1981) (holding that confronting a defendant with unlawfully seized evidence renders a subsequent statement involuntary and therefore inadmissible).

We consequently overrule this assignment of error.

E.

[5] Defendant next assigns as error the trial court's refusal to allow the testimony of one who would have been defendant's fifth alibi witness and whom defendant had failed to include on a master list of all his potential witnesses. We find no merit in the assignment.

The trial court required witness lists from both the State and defendant before jury selection as a means of screening out potential jurors who might have known the witnesses. To this end, the trial judge instructed counsel on both sides that absent extraordinary or special circumstances, only listed witnesses would be allowed to testify. The judge distributed to both counsel a list of witnesses who had appeared at defendant's first trial. Counsel then compiled their own lists and submitted them to the court. Before the master list was distributed to the jury, the court inquired whether both counsel had listed all potential witnesses. They assured the court that they had.

## STATE v. SANDERS

[327 N.C. 319 (1990)]

At trial defendant called Thomas Conley to testify. During a subsequent bench conference, the trial court advised defense counsel that Conley's name was not on the master list. Because Conley had testified at the first trial, his name had been included on the initial list distributed to both counsel by the court. Defense counsel later omitted Conley's name when returning the list. The State objected to Conley's testifying, and defendant offered no explanation as to why Conley had not been listed. The court sustained the objection. Defendant made no offer of proof or otherwise attempted to place Conley's testimony in the record.

Later in the trial defendant again called Conley. Another bench conference was conducted, and a similar discussion ensued. The State's objection was again sustained, and defendant again failed to preserve Conley's testimony for appellate review. Defendant asserts that the trial court's refusal to allow Conley to testify was reversible error. We disagree.

Exclusion of Conley's testimony was within the sound discretion of the trial judge.

> It is within the discretion of the trial judge to decide whether a witness shall testify when his name does not appear on a list of witnesses . . . . The Judge's ruling will not be reversed absent a showing of abuse of discretion. *State v. Anderson*, 281 N.C. 261, 188 S.E.2d 336 (1972). Under such circumstances, we think it to be the better practice before ruling for the Court to interrogate the jurors as to their relationship with the tendered witnesses. Although this procedure was not followed here, we find no prejudice to defendants.

*State v. Spaulding*, 288 N.C. 397, 414, 219 S.E.2d 178, 188-89 (1975). So it is here. The trial judge's decision to sustain the State's objection to Conley as a witness was not an abuse of discretion. Defendant received explicit instructions that, absent any extraordinary or special circumstances, only those names submitted on the master list would be allowed to testify. Defendant stated before trial that the list he returned was complete. He did not explain why he omitted Conley's name, and expressed no special circumstances or need for Conley's testimony. At least two of defendant's other four alibi witnesses testified to defendant's whereabouts at 8 p.m. on the night of Jackie Lee's murder, which was what Conley testified to at the first trial. If Conley would have testified consistently in the second trial, the testimony would have been merely cumulative.

For these reasons, even had defendant properly preserved Conley's testimony for appellate review, he has failed to show an abuse of discretion. This assignment of error is overruled.

### F.

[6] Defendant next assigns error to the prosecutor's closing argument. We find no merit in this assignment of error.

The challenged portion of the argument follows:

And I'm bound by an oath, also, as your District Attorney. I took an oath to fairly enforce the criminal laws, and that's what I intend to do.

And if I smell, or have any notion in my intimate involvement with a criminal lawsuit, involvement that involves paperwork to the extent that it fills up this bucket that you see me lug around all week, if I smell something foul, then I'll be the first one to walk to this desk right over here and say, "Ms. McMahan, you give me a dismissal. I'm going to dismiss this lawsuit."

I'm not going to operate that way. My conscience means more to me than that. My law license means more to me than that.

Defendant failed to object to this argument at trial. Objections to a prosecutor's closing argument to the jury should be made before the verdict to preserve the alleged error for appeal. *State v. Brock*, 305 N.C. 532, 290 S.E.2d 566 (1982). "In the absence of such objection, we will review the prosecutor's argument to determine only whether it was so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the error." *State v. Allen*, 323 N.C. 208, 226, 372 S.E.2d 855, 865 (1988). Arguments by counsel are ordinarily left to the sound discretion of the judge who tries the case, and whose decisions will be upheld unless the impropriety of counsel was gross and purposely designed to prejudice the jury unfairly against defendant. *State v. Bruce*, 315 N.C. 273, 337 S.E.2d 510 (1985); *State v. Locklear*, 291 N.C. 598, 231 S.E.2d 256 (1977).

Defendant contends that the argument meets this standard. We disagree.

STATE v. SANDERS

[327 N.C. 319 (1990)]

The prosecutor made this argument directly following defendant's closing statements, when defense counsel had claimed repeatedly that the State's case was the result of a "setup," that the criminal investigation was unfair and conducted "by an officer . . . that's [sic] got a special interest," and that the police officers involved suffered from a "total lack of credibility." We have held that "[t]he prosecutor may defend his tactics, as well as those of the investigating authorities when their propriety is challenged." *State v. Mason*, 315 N.C. 724, 735, 340 S.E.2d 430, 437 (1986). We hold that the prosecutor's argument in response to defendant's allegation of a "setup" if improper at all was not so grossly improper as to require the trial court to intervene *ex mero motu*.

This assignment of error is overruled.

### III.

[7] We now turn to defendant's assignments of error regarding the sentencing proceeding. Because we find that there is error under *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369, we remand for a new sentencing proceeding.

In *McKoy* the United States Supreme Court condemned North Carolina's jury instructions which required that the jury unanimously find the existence of a mitigating circumstance before individual jurors could consider that circumstance when later determining the ultimate recommendation as to punishment. Such a unanimity requirement is unconstitutional because, in violation of the eighth and fourteenth amendments, it "prevent[s] the sentencer from considering all mitigating evidence." *McKoy*, 494 U.S. at ---, 108 L. Ed. 2d at 376.

Because the instructions at defendant's trial contained these unanimity requirements, defendant is entitled to a new sentencing proceeding unless we can say the error was harmless beyond a reasonable doubt. *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426. The State must demonstrate harmlessness beyond a reasonable doubt because the error is of constitutional dimension. N.C.G.S. § 15A-1443. The State has failed to meet its burden.

Two proposed specified mitigating circumstances were presented to the jury together with a "catchall" issue regarding any unspecified circumstances the jury might find. The jury found unanimously the mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturb-

STATE v. SANDERS

[327 N.C. 319 (1990)]

ance. However, it failed to find unanimously that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. It also failed to find unanimously that any other unspecified circumstance or circumstances arising from the evidence had mitigating value.

Because there was evidence to support the submitted but unfound mitigating circumstances, the *McKoy* error was not harmless. Much of the evidence tending to show that defendant was suffering from mental or emotional disturbance at the time of the murder would also have supported a conclusion that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Dr. Royal testified that defendant had a "significant mental illness," possibly "schizophrenia-paranoid type," and had "manic depressive-like symptoms." For example, defendant told Dr. Royal of his belief that the defense attorney, the prosecutor, and the court were conspiring to put defendant away. Dr. Royal observed during interviews that defendant did not express an appreciation or understanding of the seriousness of the charges against him. According to Dr. Royal:

> In Mr. Sanders' situation, even with talking about his legal charges, the fact that they were serious, that they could mean the termination of his life, that's what was going to be involved, he would be inappropriately jolly smiling, laughing. In a manner that was — that we thought was inappropriate and involved a significant illness.

Defendant also suffered rapid mood changes, resisted medical treatment, and exhibited antisocial traits. His I.Q. was 72, which means defendant suffered from borderline mental retardation.

Though this evidence does not *explicitly* address defendant's capacity to appreciate the criminality of his conduct or to conform his actions to the requirements of the law, it is nevertheless sufficient to allow a reasonable juror examining defendant's behavior, mental problems, and intelligence to conclude that defendant's capacity was impaired.

There was therefore evidence which would have reasonably permitted one or more jurors to find and consider the mitigating circumstance which was not unanimously found and thus not considered by any juror in the final balancing process. Had the unanimity instruction not been given, one or more jurors might have found

STATE v. SANDERS

[327 N.C. 319 (1990)]

and considered these additional mitigating circumstances and reached a different conclusion as to sentence. At least we cannot say beyond a reasonable doubt that this would not have occurred. We cannot conclude, therefore, that error in the unanimity instruction was harmless beyond a reasonable doubt. *See State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426; *State v. Brown*, 327 N.C. 1, 394 S.E.2d 434 (1990).

The State argues that because defendant did not object to the unanimity instructions at trial, this assignment of error must be addressed under the plain error rule pursuant to Appellate Rule 10(b)(2). For the reasons given in *State v. Sanderson*, 327 N.C. 397, 394 S.E.2d 803 (1990), we elect not to apply Appellate Rule 10(b)(2), but to apply instead Appellate Rule 2 and consider the *McKoy* error as if defendant had timely objected to it at trial.

Because events leading to defendant's remaining assignments of error to the capital sentencing proceeding will not necessarily recur at the new sentencing proceeding, we do not address them.

IV.

In summary, we hold that in the guilt determination proceeding in both the rape (No. 81CRS2879) and murder (No. 81CRS2850) cases there was no error. No error regarding defendant's sentence in the rape case has been assigned or argued, and we find none. Because of *McKoy* error in the sentencing proceeding in the murder case, the matter must be remanded for a new sentencing proceeding.

Case No. 81CRS2879—No error.

Case No. 81CRS2850—No error in guilt proceeding; remanded for a new sentencing proceeding.