**STATE v. VERKERK**

[229 N.C. App. 416 (2013)]

STATE OF NORTH CAROLINA
v.
DOROTHY HOOGLAND VERKERK

No. COA12-1579

Filed 3 September 2013

**Search and Seizure—motor vehicle stop—fire department lieu-
tenant—government agent—reasonable suspicion**

The trial court erred in a driving while impaired case by deny-
ing defendant's motion to suppress evidence that was obtained as
the result of a vehicle stop performed by a lieutenant of the Chapel
Hill Fire Department. The case was remanded for further findings
as to whether the lieutenant was acting as a government agent or a
private citizen at the time that he stopped defendant's vehicle; (2)
whether, if the lieutenant was acting as a government agent at the
time that he stopped Defendant's vehicle, the stop was supported
by the necessary reasonable articulable suspicion; and (3) whether,
in the event that the stop of defendant's vehicle was not supported
by the necessary reasonable articulable suspicion, the evidence
obtained by officers of the Chapel Hill Police Department must
be suppressed.

Judge ROBERT C. HUNTER concurs in part and dissents in part.

Appeal by defendant from judgment entered 7 September 2012 by
Judge A. Robinson Hassell in Orange County Superior Court. Heard in
the Court of Appeals 22 May 2013.

*Attorney General Roy Cooper, by Assistant Attorney General
Lauren D. Tally, for the State.*

*Law Office of Matthew Charles Suczynski, PLLC, by Matthew C.
Suczynski and Michael R. Paduchowski, for Defendant-appellant.*

ERVIN, Judge.

Defendant Dorothy Hoogland Verkerk appeals from a judgment sen-
tencing her to a term of 24 months imprisonment and suspending that
sentence for a period of 18 months on the condition that she serve an
active term of 30 days imprisonment, be on supervised probation for
a period of 18 months, comply with the usual terms and conditions of

probation, pay a $1,000.00 fine and the costs, perform 72 hours of community service, and not drive until properly licensed to do so based upon her conviction for driving while impaired. On appeal, Defendant argues that Judge Elaine Bushfan erred by denying her motion to suppress evidence that she contends was obtained as the result of an unconstitutional vehicle stop performed by Lieutenant Gordon Shatley of the Chapel Hill Fire Department. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant's conviction must be vacated and that this case must be remanded to the Orange County Superior Court for the entry of a new order containing findings of fact and conclusions of law that adequately address the issues raised by Defendant's suppression motion.

## I. Factual Background

### A. Substantive Facts

At around 10:30 p.m. on 27 May 2011, Lieutenant Shatley was dispatched to 1512 East Franklin Street in Chapel Hill in response to a fire alarm. At the time that Lieutenant Shatley's fire engine stopped at the intersection of Estes Drive and Fordham Boulevard, he noticed a light-colored Mercedes approaching the intersection on his left. Although there was a "pouring downpour," the headlights on the Mercedes were not on. Instead, the Mercedes was illuminated solely by an interior dome light and auxiliary front lights. A window in the Mercedes was partially down despite the rain, and the vehicle was stopped partway into the intersection, "further out into the road than you would normally stop at a stoplight."

After the traffic light turned green, Lieutenant Shatley's fire engine continued on its way to the location associated with the fire alarm. Upon arriving at the location to which he had been dispatched, Lieutenant Shatley learned that another fire engine had already responded to the call and that he could return to the fire station. As he drove back towards the fire station along Fordham Boulevard, Lieutenant Shatley saw the same Mercedes ahead of him. An amber light, which appeared to be either a turn signal or a hazard light, on the vehicle was flashing. Although the Mercedes did not appear to be moving at the time that he first saw it, Lieutenant Shatley observed as the fire engine drew closer that was it proceeding at approximately 30 m.p.h., some fifteen miles per hour below the posted speed limit of 45 m.p.h. In addition, the Mercedes repeatedly weaved over the center line before moving to the far right fog line. After making these observations, Lieutenant Shatley radioed police communications, reported that he was following a possibly impaired

driver, and provided his location and a description of the vehicle in question.

After the Mercedes exited onto Raleigh Road, which was the same direction that the fire engine needed to go in order to return to the station, Lieutenant Shatley followed it. As it entered the ramp leading to Raleigh Road, the Mercedes drove out of its lane and onto an area marked "not for traffic." Upon entering Raleigh Road, the Mercedes got into the center lane; however, it continued to weave in and out of its lane of travel. As Lieutenant Shatley followed the Mercedes, he observed that, upon approaching an intersection simultaneously with a passing bus, the Mercedes drifted into the bus' lane of travel and came within three feet of hitting it. At an intersection, Lieutenant Shatley made another call to report the location of a possibly impaired driver.

As the Mercedes continued to weave in and out of its lane of travel and other vehicles were passing both the fire truck and the Mercedes, Lieutenant Shatley instructed the fire truck's driver to activate the vehicle's red lights. Lieutenant Shatley did not order that this action be taken in order to effectuate a "traffic stop;" instead, Lieutenant Shatley acted in this manner in the hope that other cars would stop passing them. Lieutenant Shatley testified that, if the car had not stopped, he intended to continue following it and providing police communications with additional updates concerning the vehicle's location.

At the time that Lieutenant Shatley activated the fire engine's red lights and tapped the siren twice, the Mercedes drifted to the right in an abrupt manner and hit the gutter curbing with sufficient force that sparks resulted from the contact that the rim of the Mercedes made with the curbing before coming to a stop. Once the fire truck had stopped behind the Mercedes, Lieutenant Shatley called police communications to report the vehicle's location and then spoke with Defendant, who was driving the Mercedes. Lieutenant Shatley did not ask Defendant if she had been drinking or request that she perform field sobriety tests. However, when Defendant asked why he had stopped her, Lieutenant Shatley explained that he was "concerned because of her driving" and "just wanted to make sure she was okay."

After speaking with Defendant for a few minutes without hearing anything from the Chapel Hill Police Department, Lieutenant Shatley, who had intended to ask one of the assistant firefighters to park Defendant's car, inquired of Defendant as to whether she would be willing to park her car and have someone pick her up. Although Defendant agreed to this request, she then "drove off" while Lieutenant Shatley

"just stood there" and watched as she turned onto Environ Way, a side street to the right of Raleigh Road.

Shortly after Defendant drove off, officers of the Chapel Hill Police Department arrived on the scene. Lieutenant Shatley reported the observations that he had made about Defendant's driving and pointed out her vehicle to investigating officers. Upon receiving the information which Lieutenant Shatley provided, officers of the Chapel Hill Police Department pursued Defendant and stopped her vehicle. In the meantime, Lieutenant Shatley left the scene and returned to the fire station. To the best of Lieutenant Shatley's recollection, about "ten minutes maybe" had elapsed between the time he activated his red lights and the time at which officers of the Chapel Hill Police Department arrived.

### B. Procedural History

On 27 May 2011, a citation charging Defendant with driving while impaired and driving while license revoked was issued. On 10 January 2012, Judge Lunsford Long found Defendant guilty of driving while impaired and entered a judgment imposing a Level I punishment. On 19 January 2012, Defendant noted an appeal to the Orange County Superior Court for a trial *de novo*.

On 23 July 2012, Defendant filed a motion seeking to have any evidence obtained as a result of the stopping of her vehicle suppressed. A hearing on Defendant's suppression motion was held before Judge Bushfan on 2 August 2012.[1] On 23 August 2012, Judge Bushfan entered an order denying Defendant's suppression motion on the grounds that (1) the stopping of Defendant's Mercedes did not constitute a seizure for Fourth Amendment purposes; (2) in the alternative, if the stopping of Defendant's vehicle constituted a seizure, it represented a lawful detention by a private citizen as authorized by N.C. Gen. Stat. § 15A-404(b); and (3) in the alternative, if the stop of Defendant's car constituted a seizure that was not authorized by N.C. Gen. Stat. § 15A-404, the seizure in question was neither a violation of Defendant's constitutional rights nor the result of a substantial violation of any provision of Chapter 15A of the North Carolina General Statutes.

---

1. At the hearing concerning Defendant's suppression motion, the State rested after offering Lieutenant Shatley's testimony and Defendant refrained from presenting any evidence. At the time that the State rested, the prosecutor informed Judge Bushfan that, while he had other witnesses available, he believed that Lieutenant Shatley's testimony sufficed to support the denial of Defendant's suppression motion and had decided to rely on his testimony without supplementation by the testimony of other witnesses for that purpose.

On 7 September 2012, Defendant entered a negotiated plea of guilty to driving while impaired and stipulated that she was subject to Level I punishment on the understanding that the State would voluntarily dismiss the driving while license revoked charge and that sentencing would be in the discretion of the court. In the transcript of plea which embodied her plea agreement, Defendant specifically reserved the right to seek appellate review of the denial of her suppression motion. After accepting Defendant's plea, the trial court entered a judgment sentencing Defendant to a term of 24 months imprisonment and suspending that sentence for a term of 18 months on the condition that Defendant serve an active term of 30 days imprisonment, be subject to supervised probation for a period of 18 months, pay a $1,000.00 fine and the costs, comply with the usual terms and conditions of probation, perform 72 hours of community service, and not drive until properly licensed to do so. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

### A. Standard of Review

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011) (citing *State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994)). "When findings of fact are not challenged on appeal, 'such findings are presumed to be supported by competent evidence and are binding on appeal.' " *State v. Washington*, 193 N.C. App. 670, 672, 668 S.E.2d 622, 624 (2008) (quoting *State v. Baker*, 312 N.C. 34, 37, 320 S.E.2d 670, 673 (1984) (internal quotation marks omitted)), *disc. review denied*, 363 N.C. 138, 674 S.E.2d 420 (2009). "Conclusions of law are reviewed *de novo* and are subject to full review. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Cathcart*, __ N.C. App __, __, 742 S.E.2d 321, 323 (2013) (quoting *Biber*, 365 N.C. at 168, 712 S.E.2d at 878 (internal citations and quotation marks omitted)). "'[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found.' " *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000) (quoting *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997)), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305 (2001). As a result, when "the trial court mistakenly applies an incorrect legal standard in determining whether a defendant's constitutional rights have been violated for purposes of a motion to suppress, the appellate court must remand the matter to

the trial court for a 'redetermination' under the proper standard." *State v. Williams*, 195 N.C. App. 554, 561, 673 S.E.2d 394, 399 (2009) (quoting *State v. Buchanan*, 353 N.C. 332, 339-40, 543 S.E.2d 823, 828 (2001)).

## B. Seizure

"Both the United States and North Carolina Constitutions protect against unreasonable searches and seizures. U.S. Const. amend. IV; N.C. Const. art. I, § 20. Although potentially brief and limited in scope, a traffic stop is considered a 'seizure' within the meaning of these provisions." *State v. Otto*, 366 N.C. 134, 136-37, 726 S.E.2d 824, 827 (2012) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979)). "Traffic stops have 'been historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).'" *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008) (citation omitted). For that reason, "reasonable suspicion is the necessary standard for traffic stops[.]" *Styles*, 362 N.C. at 415, 665 S.E.2d at 440 (citations omitted). "As articulated by the United States Supreme Court in *Terry*, the stop must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Otto*, 366 N.C. at 137, 726 S.E.2d at 827 (quoting *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906) (citations omitted). "The only requirement [for reasonable suspicion] is a minimal level of objective justification, something more than an 'unparticularized suspicion or hunch.'" *State v. Watkins*, 337 N.C. 437, 442, 446 S.E.2d 67, 70 (1994) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 11 (1989) (internal quotation marks omitted)). As a result of the fact that the record clearly reflects that Defendant stopped her Mercedes following activation of the flashing lights and siren with which the fire engine that Lieutenant Shatley commanded was equipped, we have no hesitation in concluding that, assuming that the other prerequisites for the application of the exclusionary rule exist, the stopping of Defendant's car constituted a "seizure" for Fourth Amendment purposes and that the trial court erred by reaching a contrary conclusion. Having made that determination, we must now address a number of other issues which are clearly present given the unusual set of facts which exist in this case.[2]

---

2. The remainder of this opinion will focus upon Defendant's constitutional challenge to the trial court's order. Although Defendant states on a number of occasions in her brief that her suppression motion should have been allowed pursuant to N.C. Gen. Stat. § 15A-974(a)(2) (requiring the suppression of evidence obtained "as a result of a substantial violation of the provisions of this Chapter" committed in the absence of "an objectively

## C. Lieutenant Shatley's Status

"The Exclusionary Rule was established in *Weeks v. United States*, 232 U.S. 383, [34 S. Ct. 341,] 58 L. Ed. 652 [] (1914), as applicable to federal law enforcement officials and was made binding on the states [and was overruled in part on other grounds] in *Mapp v. Ohio*, 367 U.S. 643, [81 S. Ct. 1684,] 6 L. Ed. 2d 1081 [] (1961). The Rule is a court-established remedy primarily for violation of the Fourth Amendment guarantee against 'unreasonable searches and seizures' and is designed to remedy police misconduct." *State v. Stinson*, 39 N.C. App. 313, 316, 249 S.E.2d 891, 893, *disc. review denied*, 296 N.C. 739, 254 S.E.2d 180 (1979). "The fourth amendment as applied to the states through the fourteenth amendment protects citizens from unlawful searches and seizures committed by the government or its agents. This protection does not extend to evidence secured by private searches, even if conducted illegally. The party challenging admission of the evidence has the burden to show sufficient government involvement in the private citizen's conduct to warrant fourth amendment scrutiny." *State v. Sanders*, 327 N.C. 319, 331, 395 S.E.2d 412, 420 (1990) (citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 576, 65 L. Ed. 1048, 1051 (1921), and *United States v. Snowadzki*, 723 F.2d 1427 (9th Cir. 1984), *cert. denied*, 469 U.S. 839, 105 S. Ct. 140, 83 L. Ed. 2d 80 (1984)), *cert. denied*, 498 U.S. 1051, 111 S. Ct. 763, 112 L. Ed.2d 782 (1991). "When a private party has engaged in a search and has seized property or information, the protections of the fourth amendment apply only if the private party 'in light of all the circumstances of the case, must be regarded as having acted as an instrument or agent of the State.' Once a private search has been completed, subsequent involvement of government agents does not transform the original intrusion into a government search." *State v. Kornegay*, 313 N.C. 1, 10, 326 S.E.2d 881, 890 (1985) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 2048-49, 29 L. Ed. 2d 564, 595 (1971), *abrogated in part on other grounds as stated in Horton v. California*,

---

reasonable good faith belief that the actions were lawful" considering "[t]he importance of the particular interest violated," "[t]he extent of the deviation from lawful conduct," "[t]he extent to which the violation was willful," and "[t]he extent to which exclusion will tend to deter future violations of this Chapter"), she has failed to advance an argument that explains why any evidence obtained as a result of the stopping of her Mercedes should be suppressed pursuant to N.C. Gen. Stat. § 15A-974(a)(2). As a result, we conclude that Defendant has abandoned any contention to the effect that her suppression motion should have been allowed on the grounds that the evidence in question was obtained as a result of a substantial violation of Chapter 15A of the North Carolina General Statutes. *See* N.C.R. App. P. 28(b)(6) (providing that "[i]ssues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned").

496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)), and citing *United States v. Sherwin*, 539 F.2d 1, 6 (9th Cir. 1976)).

"[D]etermining whether a private citizen's search or seizure is attributable to the State and therefore subject to constitutional scrutiny demands a totality of the circumstances inquiry. Factors to be given special consideration include the citizen's motivation for the search or seizure, the degree of governmental involvement, such as advice, encouragement, knowledge about the nature of the citizen's activities, and the legality of the conduct encouraged by the police." *Sanders*, 327 N.C. at 334, 395 S.E.2d at 422. "Where a search [or seizure] is conducted by a private citizen, but only after the government's initiation and under their guidance, it is in reality a search by the sovereign, and is subject to the Fourth Amendment." *State v. Hauser*, 115 N.C. App. 431, 436, 445 S.E.2d 73, 77 (1994) (citing *State v. Keadle*, 51 N.C. App. 660, 663, 277 S.E.2d 456, 459 (1981)), *aff'd*, 342 N.C. 382, 464 S.E.2d 443 (1995).

In *Keadle*, a university residence hall advisor found evidence of theft during an inspection of a student's dormitory room. The trial court granted the defendant's suppression motion, ruling that the residence hall advisor "acted as an agent of the state in a quasi-law enforcement capacity when he conducted his search of defendant's dorm room." *Keadle*, 51 N.C. App at 661, 277 S.E.2d at 458. On appeal, this Court reversed the trial court's decision, stating that:

> [W]here an unreasonable search is conducted by a governmental law enforcement agent, it is subject to the restraints of the fourth amendment and the exclusionary rule. Moreover, where a search is conducted by a private citizen, but only at the government's initiation and under their guidance, it is not a private search but becomes a search by the sovereign. However, a search not so purely governmental must be judged according to the nature of the governmental participation in the search process. In the instant case, we have one of those vague factual situations requiring that we look at all of the circumstances to assess the amount of governmental participation and involvement, if any, either through the resident advisor's contact with the government as an employee of the University of North Carolina or through direct governmental initiation and guidance of the search procedure. . . . [T]here is no evidence that law enforcement officials had any part whatsoever in [the advisor's] initial search of defendant's room. . . . As a resident advisor in a dormitory,

he had neither the status nor the authority of a law enforcement officer. It would serve no useful function as a deterrent to illegal governmental searches to apply the exclusionary rule in this instance.

*Keadle* at 663-64, 277 S.E.2d at 459.

Although *Keadle* is one of a relatively limited number of North Carolina cases that address the question of whether a state or local government employee who conducts what would otherwise be a search or seizure and who lacks law enforcement authority as a matter of state or local law is acting as a private citizen or as an arm of the State, the factors identified in *Sanders* and the manner in which those factors are applied in *Keadle* are similar to the approach which has been taken in other jurisdictions in addressing issues of this nature. For example, in *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010), the Court stated that

> First of all, under the applicable test, "[t]he defendant bears the burden of proving that an agency relationship exists" between the Government and the private individual. . . . [The] "two primary factors" to be considered [are]: (1) "whether the Government knew of and acquiesced in the private" individual's challenged conduct; and (2) "whether the private individual intended to assist law enforcement or had some other independent motivation."

(quoting *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003), *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1457, 158 L. Ed. 2d 90 (2004)) (internal citation omitted).

A factual situation similar to this case was present in *State v. Lavergne*, 991 So. 2d 86 (La. App. 2008), *cert. denied*, 1 So. 3d 494 (La. 2009), in which, after a volunteer firefighter stopped a suspected impaired driver, a state trooper arrived and arrested him. In light of the defendant's appeal from the denial of his suppression motion, the Louisiana Court of Appeals considered "[w]hether a Texas volunteer fireman who had activated emergency lights and sirens on his vehicle, who was reasonably believed to be a police officer, was acting under the color of state law when he stopped another vehicle." *Lavergne*, 991 So. 2d at 88. The defendant argued, on the one hand, that, "by activating his emergency lights and sirens, [the firefighter] was acting under the color of state law when he stopped the defendant's vehicle" and that, because the defendant "reasonably believed that [the firefighter] was a law enforcement official, [his] actions should be attributable to the state."

*Id.* The State, on the other hand, argued that the trial court had correctly ruled that the fireman was acting as a private citizen. In addressing the parties' arguments, the Court stated that:

> Useful criteria in determining whether an individual was acting as a private party or as an instrument or agent of the government are: (1) whether the government knew of and acquiesced in the intrusive conduct; (2) whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends; (3) whether the private actor acted at the request of the government; and (4) whether the government offered the private actor a reward.

*Lavergne* at 89 (citing *United States v. Ginglen*, 467 F. 3d 1071, 1074 (7th Cir. 2006)). After engaging in the required analysis, the Court determined that the trial court had not erred by concluding that the firefighter "acted as a private citizen in this case" given that "there is no evidence that [he] acted under the instruction of law enforcement;" that his "possession and utilization of a siren and emergency lights, items customarily used by police, did not automatically convert his actions to government actions;" and that the firefighter "stated that his primary motivation for stopping the defendant was not to assist law enforcement, but to prevent 'an accident that was going to happen any second.' " *Id.*

A number of other decisions from other jurisdictions provide additional examples of the manner in which this basic principle has been applied in particular situations. For example, in *State v. Brittingham*, 296 Kan. 597, 604, 294 P.3d 263, 268 (2013), the Kansas Supreme Court addressed the issue of whether information obtained by a housing inspector who had observed the presence of drugs in an apartment should be suppressed. In holding that the housing inspector was acting as a private citizen, the Court stated that:

> [The defendant] contends that our decision in *[State v.] Smith*, 243 Kan. 715, 763 P.2d 632 [(1988)] . . . establishes that, in this State, any government employee is subject to the constitutional prohibition against unreasonable searches and seizures any time that employee is acting within the scope of his or her employment. . . . [However, *Smith* held] that a government employee will be treated like a private citizen for Fourth Amendment search and seizure purposes where the person was acting outside of the scope of the employee's governmental duties and not

at the instigation of or in collusion with other government officials or agents.

Similarly, in *United States v. Verlin*, 979 F. Supp. 1334 (1997), a civil process server observed illegal activity while on a hunting trip. Although the defendant sought the entry of an order suppressing the evidence obtained by the process server, the trial court held that the process server, who had no authority to effectuate an arrest, search, or seizure, was acting as a private citizen:

> At the time he "seized" Verlin and "searched" Verlin's property, Leihsing was not an agent of either the state or federal government. . . . The mere fact that the Kansas code of civil procedure permits a person such as Leihsing to serve, levy and execute process, does not mean that every act taken by that person, no matter when or where, is automatically an act which would implicate the Fourth Amendment.

*Verlin*, 979 F. Supp. at 1337. Thus, the extent to which a particular person is a governmental agent or a private person hinges upon a detailed factual analysis which carefully considers all relevant facts and circumstances.

In his brief, Defendant argues that the trial court erred by ruling that, when Lieutenant Shatley used his fire engine's red lights and siren to stop her car, he was not a "State actor." However, the trial court never directly decided this issue, even though it did state in one of its conclusions of law that:

> If a vehicle seizure did occur, it was a lawful detention of the defendant pursuant to [N.C. Gen. Stat.] § 15A-404(b), which allows any private citizen to "detain another person when he has probabl[e] cause to believe that the person detained has committed, in his presence: (2) A breach of the peace[.]"

Although the language in which this conclusion is couched suggests that the trial court believed that any seizure that resulted from Lieutenant Shatley's conduct represented the act of a private citizen rather than that of a governmental actor, the trial court never explicitly determined Lieutenant Shatley's status or made the findings necessary to conduct the required analysis. More specifically, the trial court made no findings relating to (1) Lieutenant Shatley's authority or lack thereof to effect a traffic stop; (2) the degree, if any, to which law enforcement officers asked or encouraged Lieutenant Shatley to stop

Defendant or took any other action which had the effect of precipitating the stopping of Defendant's vehicle; (3) whether Lieutenant Shatley stopped Defendant for law enforcement-related reasons or because he wanted to protect Defendant and the public from the consequences of her erratic driving; and (4) any other facts which bear on the question of whether Lieutenant Shatley acted as a private or governmental actor. As a result, given that we believe that the trial court could resolve this issue in different ways based upon the findings of fact which it makes in light of the credible record evidence, we conclude that the trial court's judgment must be vacated and that this case must be remanded to the Orange County Superior Court for entry of a new order containing findings of fact and conclusions of law addressing the issues raised by Defendant's suppression motion based upon an application of the proper legal standard. If, after hearing any additional evidence that it deems necessary and making the necessary finding, the trial court concludes that Lieutenant Shatley acted as a private citizen rather than as a governmental agent at the time that Defendant's vehicle was stopped, then the trial court should deny Defendant's suppression motion and reinstate the trial court's judgment. On the other hand, if the trial court determines that Lieutenant Shatley was acting as a governmental agent at the time of the challenged traffic stop, the trial court should make additional findings and conclusions addressing the constitutionality of the stopping of Defendant's vehicle on the basis of the criteria set out later in this opinion.

Our dissenting colleague argues that this case need not be remanded to the trial court for further proceedings because "the trial court's findings establish that [Lieutenant Shatley] was a state actor[.]" According to our dissenting colleague, this determination is necessitated by the fact that Lieutenant Shatley stopped Defendant "with the use of" the lights and sirens with which his fire engine was equipped and while he was on duty and wearing his firefighter's uniform. In reaching this conclusion, our dissenting colleague overlooks the fact that, under the relevant legal standard, the undisputed evidence indicates that Lieutenant Shatley's decision to stop Defendant was made without any knowledge of or encouragement by the Chapel Hill Police Department or any other law enforcement agency and that the reason given by Lieutenant Shatley for stopping Defendant stemmed from his concern for the safety of Defendant and other drivers rather than out of a desire to apprehend Defendant and ensure that she was criminally charged. Our research has not revealed the existence of any reported decision in this or any other jurisdiction holding that an individual was acting as a government agent for Fourth Amendment purposes based solely on the fact that lights and

sirens present on official equipment were used, the fact that the individual in question was wearing a uniform, or the fact that the individual in question possessed other trappings of authority, such as a firearm or badge. As a result, although we express no opinion as to the nature of the result that the trial court should reach on remand or the extent to which the trial court should hear additional evidence before making its decision, we do believe that the trial court's existing findings do not permit a proper resolution of the issue of whether Lieutenant Shatley was acting as a private person or a governmental actor and that further proceedings must be held in the trial court in order to permit a proper resolution of that issue.

### D.  Constitutionality of the Stop of Defendant's Vehicle

The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. The United States Supreme Court has uniformly applied a reasonableness standard in determining whether a search or seizure conducted by a governmental actor passes constitutional muster, regardless of whether the individual in question is a sworn law enforcement officer. In fact, according to clearly established federal constitutional law, the extent to which a governmental actor is statutorily authorized to conduct searches and seizures has no bearing on the required constitutional inquiry. Instead, the constitutionality of all searches and seizures conducted by a governmental actor must be evaluated according to the applicable constitutional standard - the existence of probable cause for an arrest or the existence of reasonable articulable suspicion for an investigative detention.

For example, in *Virginia v. Moore*, 553 U.S. 164, 166, 128 S. Ct. 1598, 1601, 170 L. Ed. 2d 559, 564 (2008), the United States Supreme Court evaluated a challenge to the constitutionality of an arrest that was "based on probable cause but prohibited by state law." The Virginia courts had held that, since the officers in question lacked the authority to make the challenged arrest as a matter of state law, the seizure in question violated the Fourth Amendment. In reversing the Virginia court's decision, the United States Supreme Court noted that it had previously "concluded that whether state law authorized the search was irrelevant" and that "'whether or not a search is reasonable within the meaning of the Fourth Amendment' . . . has never 'depend[ed] on the law of the particular State in which the search occurs.'" *Moore*, 553 U.S. at 171-72, 128 S. Ct. at 1604, 170 L. Ed. 2d at 568 (citing *Cooper v. California*, 386 U.S. 58, 61, 87 S. Ct. 788, 790, 17 L. Ed. 2d 730, 733 (1967), and quoting *California*

*v. Greenwood*, 486 U.S. 35, 43, 108 S. Ct. 1625, 1630, 100 L. Ed. 2d 30, 39 (1988). In addition, the Court noted:

> We have applied the same principle in the seizure context. *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), held that police officers had acted reasonably in stopping a car, even though their action violated regulations limiting the authority of plainclothes officers in unmarked vehicles. We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices-even practices set by rule.

As a result, the Court held "that[,] while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections," *Moore* at 176, 128 S. Ct. at 1607, 170 L. Ed. 2d at 570-71, and that, "[w]hen officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest[.]" *Moore* at 178, 128 S. Ct. at 1608, 170 L. Ed. 2d at 571-72.

More recently, in *City of Ontario v. Quon*, __ U.S. __, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010), the United States Supreme Court addressed the constitutional implications of "the assertion by a government employer of the right . . . to read text messages sent and received on a pager the employer owned and issued to an employee." *Quon*, __ U.S. at __, 130 S. Ct. at 2624, 177 L. Ed. 2d at 221. In its opinion addressing that issue, the United States Supreme Court stated that:

> Respondents argue that the search was *per se* unreasonable in light of the Court of Appeals' conclusion that Arch Wireless violated [18 U.S.C. § 2701 *et seq.*, or the Stored Communications Act] by giving the City the transcripts of Quon's text messages. . . . [E]ven if the Court of Appeals was correct to conclude that the SCA forbade Arch Wireless from turning over the transcripts, it does not follow that petitioners' actions were unreasonable. Respondents point to no authority for the proposition that the existence of statutory protection renders a search *per se* unreasonable under the Fourth Amendment. And the precedents counsel otherwise.

*Quon*, __ U.S. at __, 130 S. Ct. at 2632, 177 L. Ed. 2d at 230 (citing *Moore* and *Greenwood*). This Court and the Supreme Court have reached the same essential conclusion concerning the relationship between the protections afforded by state law and those afforded by the Fourth

Amendment. For example, in *State v. Gwyn*, 103 N.C. App. 369, 371, 406 S.E.2d 145, 146, *disc. review denied*, 330 N.C. 199, 410 S.E.2d 498 (1991), this Court clearly stated that:

> Under *Mapp v. Ohio*, 367 U.S. 643, [81 S. Ct. 1684,] 6 L.Ed.2d 1081 (1961), the test for suppressing evidence following an arrest is not the legality of the arrest, but whether the stop and search was unreasonable. Our Supreme Court has stated that an illegal arrest is not necessarily an unconstitutional arrest, *State v. Eubanks*, 283 N.C. 556, 196 S.E.2d 706 (1973), and in *State v. Mangum*, 30 N.C. App. 311, 226 S.E.2d 852 (1976), we held that the defendant's illegal arrest beyond the policeman's territorial jurisdiction did not render the seizure and search unreasonable since the patrolman had probable cause.

As a result, according to well-established federal constitutional law and our own controlling precedent, a determination that Lieutenant Shatley lacked the statutory authority to stop Defendant's vehicle does not have any bearing upon whether the stopping of Defendant's vehicle violated the Fourth Amendment.

The United States Supreme Court has consistently applied traditional standards of reasonableness to searches or seizures effectuated by government actors who lack state law authority to act as law enforcement officers. For example, in *Michigan v. Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), the Court considered the application of the Fourth Amendment to searches of a home conducted by firefighters, and held that "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman[.]" *Tyler*, 436 U. S. at 506, 98 S. Ct. at 1948, 56 L. Ed. 2d at 496. Thus, the United States Supreme Court applied the traditional warrant requirement in evaluating the validity of a firefighter's entry into a private house and held that, even though a burning building presented an exigent circumstance rendering a warrantless entry "reasonable" for Fourth Amendment purposes, a firefighter could not lawfully reenter the house several days later without having obtained a properly issued search warrant. *Tyler*, 436 U.S. at 511, 98 S. Ct. at 1951, 56 L. Ed. 2d at 500. In reaching this conclusion, the Court analyzed the constitutionality of the firefighters' actions without giving any consideration to the issue of whether the firefighters' actions were permissible for purposes of Michigan state law.

Similarly, in *N.J. v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985), the United States Supreme Court analyzed the constitutionality of a search of a student's purse conducted by public school authorities without addressing the extent to which the search had been conducted in accordance with applicable New Jersey state law. As the Court noted at a later time, in "*T. L. O.*, we . . . applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student[.]" *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 370, 129 S. Ct. 2633, 2639, 174 L. Ed. 2d 354, 361 (2009) (citing *T.L.O.*, 469 U.S. at 342, 105 S. Ct. at 742, 83 L. Ed. 2d at 734). In making the required constitutional determination, the Court utilized the familiar "reasonable articulable suspicion" standard even though the search in question was conducted by an individual who was not a law enforcement officer.

In addition, courts in other jurisdictions have uniformly recognized that, in *Moore*, the United States Supreme Court rejected the proposition that the constitutionality of a government actor's search or seizure in any way hinged on the extent to which the action in question was permissible as a matter of state law. *See, e.g., United States v. Wilson*, 699 F.3d 235, 238 (2012) (holding that, even though Immigration and Customs Enforcement officers lacked the authority to act as law enforcement officers at the time that they stopped Defendant's vehicle, "the violation of the ICE policy requiring prior authorization did not affect the constitutionality of the stop under the Fourth Amendment"); *Johnson v. Phillips*, 664 F.3d 232, 238 (2011) (holding that, even though a building commissioner and Auxiliary Reserve Police Officer" "lacked authority under state law to conduct a traffic stop or arrest, that fact that did not establish that his conduct violated the Fourth Amendment") (citing *Moore*); and *State v. Slayton*, 147 N.M. 340, 342, 223 P.3d 337, 339 (2009) (stating that, "[w]hile we agree that the [police service aide] did not have the authority to detain or arrest an individual suspected of a crime, we disagree that a state actor's unauthorized seizure of a person suspected of committing a crime is *per se* a violation of the Fourth Amendment."). As a result, we conclude that, in the event that the trial court determines on remand that Lieutenant Shatley was a "government actor" at the time that he stopped Defendant's vehicle, it should then determine whether the stop was constitutionally permissible by determining whether the stop was supported by reasonable articulable suspicion, which is the standard applied in evaluating the constitutionality of traffic stops by law enforcement officers.

Although our dissenting colleague does not appear to dispute the essential validity of the relevant federal constitutional principles we

have outlined in this opinion, he argues, instead, that we should interpret N.C. Const. art. I, § 20, so as to grant a criminal defendant greater rights than those afforded by the federal constitution and hold that, since Lieutenant Shatley lacked the statutory authority to stop Defendant's vehicle, his actions should be deemed to be a *per se* violation of the North Carolina Constitution, resulting in the suppression of any evidence obtained as a result of the seizure of Defendant's vehicle. The fundamental problem with the position adopted by our dissenting colleague is that it rests upon an entirely new argument that is not even mentioned, much less discussed, in Defendant's brief. Although Defendant makes passing reference to the fact that unreasonable searches and seizures are prohibited under both the Fourth Amendment to the U.S. Constitution and under N.C. Const. art. I, § 20, she has not presented any argument whatsoever resting upon the language of the North Carolina Constitution, cited any authority addressing the proper interpretation of the search and seizure provisions of the North Carolina Constitution, and or urged this Court to interpret N.C. Const. art. I, § 20, differently from the manner in which the relevant issues have been resolved for Fourth Amendment purposes. As the Supreme Court of North Carolina has clearly reminded us, "[i]t is not the role of the appellate courts . . . to create an appeal for an appellant," as doing so leaves "an appellee . . . without notice of the basis upon which an appellate court might rule." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) *(per curiam)* (citation omitted). In spite of *Viar*, the dissent proposes that we resolve this case on the basis of a theory that Defendant never espoused and which the State has had no opportunity to discuss. As a result, given Defendant's failure to advance the theory on which our dissenting colleague relies in the trial court or in this Court, we decline to adopt the approach suggested by our dissenting colleague on the grounds that it is not properly before us.

We also note that the same considerations which led the United States Supreme Court to refrain from equating the protections provided by the Fourth Amendment with those afforded by state statutory law are equally applicable in the state constitutional context. Consistently with those principles, this Court and the Supreme Court have clearly held that, as far as the substantive protections against unreasonable searches and seizures are concerned, the federal and state constitutions provide the same rights. *See, e.g., State v. Hendricks*, 43 N.C. App. 245, 251-52, 258 S.E.2d 872, 877 (1979), *disc. review denied*, 299 N.C. 123, 262 S.E.2d 6 (1980) (stating that, "[t]hough the language in the North Carolina Constitution (Article I, Sec. 20), providing in substance

that any search or seizure must be 'supported by evidence,' is markedly different from that in the federal constitution, there is no variance between the search and seizure law of North Carolina and the requirements of the Fourth Amendment as interpreted by the Supreme Court of the United States") (citing *State v. Vestal*, 278 NC. 561, 577, 180 S.E. 2d 755, 766 (1971), *appeal after remand*, 283 N.C. 249, 195 S.E. 2d 297, *cert. denied*, 414 U.S. 874, 94 S. Ct. 157, 38 L. Ed. 2d 114 (1973)); *Gwyn*, 103 N.C. App. at 370-71, 406 S.E.2d at 146 (stating that, although the "[d]fendant argues that[,] because the arrest was illegal the search incident to it violated the Fourth Amendment to the United States Constitution and Article 1, Section 20, of the North Carolina Constitution, and [that,] under the Fourth Amendment's exclusionary rule[,] the evidence must be suppressed," we "do not agree" given that "North Carolina's law of search and seizure and the requirements of the Fourth Amendment to the Constitution of the United States are the same") (citing *Hendricks*); *In re Murray*, 136 N.C. App. 648, 652, 525 S.E.2d 496, 500 (2000) (stating that, "[b]ecause there is no variance between North Carolina's law of search and seizure and the requirements of the Fourth Amendment to the Constitution of the United States . . . we hold that the search was proper under the laws of North Carolina") (citing *Hendricks*); and *Hartman v. Robertson*, 208 N.C. App. 692, 697, 703 S.E.2d 811, 815 (2010) (stating that "[w]e disagree" with the "[p]etitioner's [] argument [] that, because the traffic stop was illegal, the evidence gathered subsequent to the stop should have been suppressed" on the grounds that "Article I, section 20 of our North Carolina Constitution provides the same protections as the federal Fourth Amendment") (citing Murray).[3] As a result, even if Defendant had advanced the argument upon which our dissenting

---

3. Although our dissenting colleague cites a number of decisions for the proposition that the United States Constitution serves as a constitutional floor and that the North Carolina Constitution may give citizens additional rights over and above those that are federally guaranteed, neither the Supreme Court nor this Court has ever held that the substantive protections afforded by N.C. Const. art. I, s. 20, exceed those afforded by the Fourth Amendment. Admittedly, the Supreme Court rejected the "good faith" exception to the exclusionary rule found in federal search and seizure jurisprudence in *State v. Carter*, 322 N.C. 709, 710 S.E.2d 553, 554 (1988). However, we have not found, and our dissenting colleague has not cited, any decision of this Court or the Supreme Court in which the limitations upon the actual conduct of governmental actors (as compared to the scope of the remedies which are available in the event that a constitutional violation has occurred) are greater under N.C. Const. art. I, § 20, than they are under the Fourth Amendment. As a result, we believe that we are bound by the prior decisions of this Court and the Supreme Court equating the substantive limits imposed upon the conduct of governmental actors by the Fourth Amendment with those imposed by N.C. Const. art. I, § 20.

colleagues relies in his brief, we would be bound to reject it based upon the prior decisions of this Court and the Supreme Court.[4]

### E. N.C. Gen. Stat. § 15A-404

In its order, the trial court concluded that, even if Lieutenant Shatley's stop of Defendant constituted a seizure, his actions would have been justified pursuant to N.C. Gen. Stat. § 15A-404, the so-called "citizen's arrest" statute. According to N.C. Gen. Stat. § 15A-404(b), a private citizen may "detain another person when he has probable cause to believe that the person detained has committed in his presence: (1) [a] felony, (2) [a] breach of the peace, (3) [a] crime involving physical injury to another person, or (4) [a] crime involving theft or destruction of property." The key provision in the language of N.C. Gen. Stat. § 15A-404 is "probable cause," which is the traditional standard utilized in evaluating the lawfulness of an arrest. On the other hand, nothing in N.C. Gen. Stat § 15A-404 authorizes private citizens to conduct investigatory stops based on "reasonable articulable suspicion" for the purpose of ascertaining whether a criminal offense has been committed. At the time that Lieutenant Shatley stopped Defendant's vehicle, he did not know whether she was an impaired driver or whether her erratic driving stemmed from an entirely different cause, such as illness or mechanical difficulties. Thus, the record clearly shows that Lieutenant Shatley was, at most, conducting what amounted to an investigative stop rather than detaining Defendant as authorized by N.C. Gen. Stat. § 15A-404. *See e.g.*, *State v. Benefiel*, 1997 Ida. App. LEXIS 35 (holding that the statutory right to make a "citizen's arrest" did not encompass a right to make a brief investigative seizure or "Terry stop"), *aff'd on other grounds*, *State v. Benefiel*, 131 Idaho 226, 228, 953 P.2d 976, 978 (holding that evidence obtained by a law enforcement officer conducting investigatory activities outside of his territorial jurisdiction did not violate the defendant's constitutional rights and was not subject to suppression),

---

4. Our dissenting colleague distinguishes the cases cited in the text with respect to the lack of difference between the substantive protections found in federal and state constitutional search and seizure law on the ground that none of them involve "a seizure of a defendant by [a] state actor who lacked the training and experience of a law enforcement officer." In view of the fact that the approach adopted in the dissent in reliance upon this distinction equates state statutory law with state constitutional law, the fact that this approach has no support in the search and seizure jurisprudence developed by this Court and the Supreme Court, and the fact that our decision in *Gwyn* expressly rejected such an equation for purposes of both federal and state constitutional law, we do not believe that the distinction upon which our dissenting colleague relies supports a decision to hold that the absence of any statutory authority giving a fire fighter the authority to conduct investigative detentions necessarily results in a violation of N.C. Const. art. I, § 20.

*cert. denied*, 525 U.S. 818, 119 S. Ct. 58, 142 L. Ed. 2d 45 (1998)). As a result, the trial court erred by upholding Lieutenant Shatley's decision to stop Defendant's vehicle on the basis of N.C. Gen. Stat. § 15A-404 and should not take any account of that statutory provision in conducting the required proceedings to be held on remand.

### F. Application of Exclusionary Rule

In the event that the trial court concludes on remand that Lieutenant Shatley was a government actor and that his decision to stop Defendant's vehicle was not supported by a reasonable articulable suspicion that Defendant was driving while subject to an impairing substance, it must also determine whether any evidence obtained by officers of the Chapel Hill Police Department as a result of their own activities must be suppressed. As the Fourth Circuit has stated, "[n]ot all evidence discovered as a result of a Fourth Amendment violation, though, is 'fruit of the poisonous tree' and necessarily inadmissible at trial. Evidence derived from an illegal search may be admissible depending upon 'whether, granting establishment of the primary illegality of the evidence to which the instant objection is made has been come at by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint.' " *United States v. Gaines*, 668 F.3d 170, 173 (4th Cir. 2012) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 456 (1963)) (internal quotation marks and citation omitted). Thus, the trial court may potentially be required to determine on remand whether any evidence obtained by officers of the Chapel Hill Police Department after their arrival on the scene should be suppressed in the event that it is determined that Lieutenant Shatley engaged in unconstitutional conduct while acting as a governmental agent.

In its brief, the State argues that we should uphold the trial court's decision to deny Defendant's suppression motion on the grounds that, even if Lieutenant Shatley's stop of Defendant's vehicle violated the federal and state constitutional protections against unreasonable searches and seizures, this fact does not require exclusion of the evidence obtained as a result of her arrest by law enforcement officers. According to the State, since "[t]he stop of defendant by Chapel Hill Police Department was independent of any stop by [Lieutenant] Shatley," a proper application of "the independent source rule[, which] provides that evidence obtained illegally should not be suppressed if it is later acquired pursuant to a constitutionally valid search or seizure," *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006) (citing *State v. Phifer*, 297 N.C. 216, 224-26, 254 S.E.2d 586, 590-91 (1979)), would necessitate a

determination that any evidence obtained as a result of the activities of the Chapel Hill Police Department would still be admissible.

In addition, the State argues that, even if Lieutenant Shatley's stop of Defendant's vehicle was unconstitutional, evidence of her impaired driving should be admitted pursuant to the inevitable discovery doctrine. "The United States Supreme Court in *Nix v. Williams*, 467 U.S. 431, [104 S. Ct. 2501,] 81 L. Ed. 2d 377 (1984), held that evidence which would otherwise be excluded because it was illegally seized may be admitted into evidence if the State proves by a preponderance of the evidence that the evidence would have been inevitably discovered by the law enforcement officers if it had not been found as a result of the illegal action." *State v. Pope*, 333 N.C. 106, 114, 423 S.E.2d 740, 744 (1992). In seeking to persuade us to accept its inevitable discovery argument, the State points out that Lieutenant Shatley "testified [that] he repeatedly contacted communications relaying his concern about defendant's driving, providing defendant's location, and requesting Chapel Hill police officers to respond" and argues that, in light of these communications, Defendant's vehicle would inevitably have been stopped by law enforcement officers. The record does, as the State contends, indicate that Lieutenant Shatley called police communications on multiple occasions for the purpose of reporting his current location and providing a description of Defendant's vehicle; that Lieutenant Shatley called police communications yet again to report the location at which Defendant's vehicle had been stopped; and that law enforcement officers arrived about "ten minutes maybe" after the stop. As a result, the State makes a colorable inevitable discovery argument as well.

The trial court did not address any of these exclusionary rule-related issues in its initial order. Although a determination that Lieutenant Shatley acted unconstitutionally would necessarily require the suppression of any evidence obtained at the time that he stopped Defendant's vehicle, the same is not necessarily true of evidence obtained after officers of the Chapel Hill Police Department arrived on the scene. Thus, in the event that the trial court concludes that a constitutional violation occurred at the time that Lieutenant Shatley stopped Defendant's vehicle, the trial court should, on remand, make findings of fact and conclusions of law addressing the issue of the extent, if any, to which evidence stemming from Defendant's arrest by officers of the Chapel Hill Police Department must be suppressed as the result of Lieutenant Shatley's conduct as well.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court's judgment should be vacated and that this case should be

remanded to the Orange County Superior Court for further proceedings. On remand, the trial court should take any additional evidence that, in the exercise of its discretion, it chooses to receive and enter a new order ruling on the issues raised by Defendant's suppression motion containing appropriate findings and conclusions addressing the issues of whether: (1) Lieutenant Shatley was acting as a government agent or a private citizen at the time that he stopped Defendant's vehicle; (2) whether, if Lieutenant Shatley was acting as a government agent at the time that he stopped Defendant's vehicle, the stop was supported by the necessary reasonable articulable suspicion; and (3) whether, in the event that the stop of Defendant's vehicle was not supported by the necessary reasonable articulable suspicion, the evidence obtained by officers of the Chapel Hill Police Department must be suppressed, including a consideration, to the extent necessary, of whether any information obtained by the Chapel Hill Police Department must be suppressed under the "fruit of the poisonous tree" doctrine or whether any evidence obtained by officers of the Chapel Hill Police Department would be rendered admissible by the independent source or inevitable discovery rules. In the event that the trial court determines, after conducting the required proceedings on remand, that Defendant's suppression motion should be denied, the trial court will reinstate the judgment that has been previously entered against Defendant. In the event that the trial court determines, after conducting the required proceedings on remand, that Defendant's suppression motion should be allowed, the trial court will order that Defendant receive a new trial.

REVERSED AND REMANDED.

Judge STROUD concurs.

HUNTER, Robert C., Judge concurring in part and dissenting in part.

I concur with the majority's conclusion that Lieutenant Shatley's stop of defendant's car constituted a seizure in the context of the Fourth Amendment of the United States Constitution. I also agree with the majority that Lieutenant Shatley was not authorized to stop defendant under N.C. Gen. Stat. § 15A-404. However, while the majority remands the matter to the trial court for a determination of whether Lieutenant Shatley was a state actor, I conclude that Lieutenant Shatley was not acting as a "private person" when he stopped defendant. He seized defendant while acting in his official capacity as a fireman, a state actor, and did so without lawful authority in violation of defendant's rights under

Article I, Section 20 of the North Carolina Constitution. Accordingly, I respectfully dissent from that part of the majority's opinion, and I would reverse the trial court's order denying her motion to suppress, vacate the judgment, and remand to the trial court.

In her motion to suppress, defendant argued that the evidence obtained as a result of the traffic stop was illegally obtained in violation of the Fourth Amendment and its parallel provision in the North Carolina Constitution. The trial court concluded the Lieutenant Shatley's stop of defendant was not a seizure triggering defendant's Fourth Amendment protections nor a violation of her other constitutional rights. Although not addressed at length, defendant again raised the argument that her stop by Lieutenant Shatley was in violation of the protections afforded to her by Article I, Section 20 of the North Carolina Constitution.

"Article I, Section 20 of our North Carolina Constitution, like the Fourth Amendment, protects against unreasonable searches and sei-zures," *State v. McClendon*, 350 N.C. 630, 636, 517 S.E.2d 128, 132 (1999), and it requires the exclusion of evidence obtained by such unlawful means, *State v. Carter*, 322 N.C. 709, 712, 370 S.E.2d 553, 555 (1988). The relevant provision of our state constitution provides: "General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particu-larly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20.

Because our Constitution and the Fourth Amendment provide these similar protections, caselaw interpreting the Fourth Amendment may provide guidance in our interpretation of Article I, Section 20. *Carter*, 322 N.C. at 712, 370 S.E.2d at 555. Yet, despite the similarities between Article I, Section 20 and the Fourth Amendment, the provisions are not identical, and we are not precluded from determining that Article I, Section 20 confers rights to our citizens that are distinct from those conferred by the Fourth Amendment. *See McClendon*, 350 N.C. at 635, 517 S.E.2d at 132 ("[W]e are 'not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States.' ") (quoting *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984)).

The majority cites to several cases for the proposition that had defendant argued that her stop was unlawful under our state constitu-tion, the majority would be bound by our prior decisions to reject the argument. *See State v. Hendricks*, 43 N.C. App. 245, 251-59, 258 S.E.2d

872, 877-82 (1979) (concluding that a search of the defendant's home and vehicle by law enforcement officers via the use of an electronic tracking device was lawful under the Fourth Amendment and Article 1, Section 20), *disc. review denied*, 299 N.C. 123, 262 S.E.2d 6 (1980); *State v. Gwyn*, 103 N.C. App. 369, 371, 406 S.E.2d 145, 146 (1991) (concluding that the defendant's arrest in Virginia by a North Carolina police officer did not render the search and seizure unreasonable under our federal or state constitutions), *disc. review denied*, 330 N.C. 199, 410 S.E.2d 498; *In re Murray*, 136 N.C. App. 648, 652, 525 S.E.2d 496, 499-500 (2000) (analyzing whether a school official's search of a student's book bag was unreasonable under North Carolina law); *Hartman v. Robertson*, 208 N.C. App. 692, 697-98, 703 S.E.2d 811, 815-16 (2010) (concluding that evidence obtained after a police officer stopped the defendant's vehicle was not subject to the exclusionary rule when the evidence is presented in a license revocation hearing, which is a civil proceeding). I conclude these cases are distinguishable as they do not involve a seizure of a defendant by a state actor who lacked the training and experience of a law enforcement officer, as occurred in this case.

Moreover, I cannot dispute that our state Constitution provides the same rights as the Fourth Amendment, but our caselaw also holds that Article 1, Section 20 may provide rights in addition to those provided by the Fourth Amendment. As the Supreme Court of North Carolina has previously stated, "the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution." *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 475, 515 S.E.2d 675, 692 (1999); *see Jones v. Graham Cnty. Bd. of Educ.*, 197 N.C. App. 279, 289-93, 677 S.E.2d 171, 178-82 (2009) (noting that "[i]f we determine that the policy does not violate the Fourth Amendment, we may then proceed to determine whether Article I, Section 20 provides basic rights in addition to those guaranteed by the [Fourth Amendment]", and concluding that while a suspicionless search may be reasonable under the Fourth Amendment under certain circumstances the defendant-employer's suspicionless drug testing policy violated plaintiff-employees' rights to be free from unreasonable searches under Article I, Section 20 of our state constitution) (citation and quotation marks omitted)); *Carter*, 322 N.C. at 710, 370 S.E.2d at 554 (holding there is no good faith exception to the requirements of Article I, Section 20 as applied to the defendant and declining to analyze whether the search and seizure at issue violated the defendant's rights under the Fourth Amendment of the federal constitution). However, due to

the relatively limited body of caselaw interpreting Article I, Section 20, reference to caselaw that determines our citizens' rights under the Fourth Amendment is helpful in our analysis, but it does not control the resolution of this case.

Under the Fourth Amendment, "[t]he right to be free from unreasonable searches and seizures applies to seizures of the person, including brief investigatory stops." *In re J.L.B.M.*, 176 N.C. App. 613, 619, 627 S.E.2d 239, 243 (2006). Such investigatory stops must be based on reasonable suspicion that criminal activity may have taken place. *Id.* Reasonable suspicion is based upon "'specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, *guided by [the officer's] experience and training.*' " *Id.* (quoting *State v. Watkins*, 337 N.C. 437, 441-42, 446 S.E.2d 67, 70 (1994) (emphasis added)).

Although the majority remands the case for the trial court to make additional findings as to whether Lieutenant Shatley was a state actor when he seized defendant, I conclude the trial court's findings establish that he was a state actor and that he violated defendant's right to be free from unlawful seizure under our state constitution. The trial court found that Lieutenant Shatley stopped defendant with the use of Fire Engine 32, of which he was in command and which was returning to the fire station after being dispatched to the scene of a possible fire. After notifying "emergency communications" that defendant may be an impaired driver, Lieutenant Shatley "ordered" the driver of the fire engine to activate its red lights, sirens, and horn to cause defendant to stop her vehicle. Once stopped, Lieutenant Shatley did not pass defendant, but parked Engine 32 behind defendant's vehicle. Lieutenant Shatley exited the fire truck and approached defendant wearing his firefighter's uniform. The fire engine's emergency lights continued to flash as defendant asked Lieutenant Shatley why he had stopped her, and he spoke to defendant for at least ten minutes. Chapel Hill police officers arrived on the scene shortly thereafter.

Had Lieutenant Shatley been a police officer with the appropriate training and experience as well as the lawful authority to stop defendant, defendant's erratic driving would likely support a finding of the reasonable suspicion necessary to effectuate an investigatory stop. Although Lieutenant Shatley had limited authority to enforce traffic laws at the scene of a fire or other hazards pursuant to N.C. Gen. Stat. § 20-114.1(b), the statute provides that firemen are not considered law enforcement or traffic control officers. Thus, the legislature has strictly limited the law enforcement authority of firemen to a narrow set of

situations related to the execution of their duties as firemen. *See id.* If the legislature intended to give firemen the authority to enforce traffic laws at all times, it could do so. However, under our current statutes, Lieutenant Shatley had no lawful authority or training to stop defendant. Because Lieutenant Shatley used the appearance of the state's police powers to effectuate a traffic stop, I conclude that he was a state actor acting outside of his lawful authority to seize defendant.

To permit state actors who do not have appropriate law enforcement authority, training, and experience to make traffic stops would potentially result in greater harm than not stopping someone who commits a motor vehicle violation. "'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, *unless by clear and unquestionable authority of law.*'" *Terry v. Ohio*, 392 U.S. 1, 9, 20 L. Ed. 2d 889, 898-99 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 737 (1891) (emphasis added)). As our Supreme Court has aptly noted:

> One of the great purposes of the exclusionary rule is to impose the template of the constitution on police training and practices. Unavoidably, a few criminals may profit along with the innocent multitude from this constitutional arrangement . . . . "He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him."

*Carter*, 322 N.C. at 720, 370 S.E.2d at 560 (citation omitted).

"A ruling admitting evidence in a criminal trial . . . has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Terry*, 392 U.S. at 13, 20 L. Ed. 2d at 901. If state personnel who are not trained as law enforcement officers are permitted to execute traffic stops without lawful authority, experience, and training, but under the color of state police power, and the evidence obtained from such a seizure is admitted in a criminal prosecution, our courts will "be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions[,]" *id.*

Such actions are "dangerous to [the] liberty" of our citizens, N.C. Const. art. I, § 20, a violation of defendant's right to be free from unlawful seizure under our state constitution, and should not be condoned by our

courts. Accordingly, I conclude that the trial court should have granted defendant's motion to suppress to exclude the evidence obtained from Lieutenant Shatley's seizure of defendant.